In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2367

Lesley Gentry,

Plaintiff-Appellee,

v.

Export Packaging Company,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99-4012--Joe B. McDade, Chief Judge.

Argued December 8, 2000--Decided January 25, 2001


        Before Flaum, Chief Judge, and Ripple and Evans,
Circuit Judges.

        Flaum, Chief Judge.  Export Packaging Company is
appealing the jury verdict in favor of Lesley
Gentry concerning a Title VII hostile work
environment sexual harassment claim. For the
reasons stated herein, we affirm.

I.  Background

        Lesley Gentry was hired by Export Packaging
Company ("Export") as a temporary employee in
October of 1997. She became a permanent employee
on December 1, 1997 and transferred into the
technical services department in April of 1998,
assuming the position of Administrative Assistant
to Technical Services. In this new position, she
served in a help desk capacity. Her immediate
supervisor was Leo Broughton. During the last
month of her employment, April of 1998, Gentry's
desk was in the same office as Broughton's. Since
Broughton began working at Export on July 5,
1988, he has been the Technical Services
Director. Broughton is considered to be middle
management because he reports to Bryon Fernald,
the company's Chief Financial Officer and its
Executive Vice President. During the eleven years
prior to May 1, 1998, when Gentry stopped working
for Export, Broughton attended two sexual
harassment training sessions.

        Gentry contends that Broughton sexually harassed
her. She claims that during a time span of

approximately four months, with most of the harassment occurring in April of 1998, Broughton subjected her to 40 hugs, 15 shoulder rubs, a kiss on her cheek, and two instances where Broughton petted her cheeks. Just before Gentry's desk was moved into Broughton's office, Gentry heard Broughton's supervisor, Fernald say that she was going to become a "sex"retary. One evening Broughton asked her to "try out the back counter" with him and Gentry believed that Broughton was requesting that she have sexual intercourse with him. On another occasion, she relates that he inquired about her staying the night with him. This time he said to her that her clothes would look better on the floor. In addition, she claims that Broughton gave her a single page "World of Love 1997, Mexico" calendar that depicted cartoon drawings of different sexual positions, one for each day, and Broughton asked her to pick out a couple of her favorite days. Gentry stated that she resisted Broughton's advances and claims that on two occasions she spoke with Vicki Hanske, the Benefits Coordinator in the Human Resources department, about Broughton's conduct. She sued Export asserting a variety of claims, including constructive discharge, retaliation, sex discrimination, and quid pro quo sexual harassment. While the majority of Gentry's claims did not survive Export's motion for summary judgment, the hostile work environment sexual harassment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq. withstood the said motion. The trial was held before a jury on April 24, 2000 and the jury on April 26, 2000 returned a verdict in favor of Gentry and against Export in the amount of $25,000, consisting of $10,000 for compensatory damages and $15,000 for punitive damages. Export now seeks a reversal of this jury award.

II.  Discussion

A.  Ellerth/Faragher Affirmative Defense

Private employers under Title VII are prohibited from discriminating on the basis of sex: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. sec. 2000e-2(a)(1). Employers can be held vicariously liable for a supervisor's/1 sexual harassment of a subordinate, but an employer may avoid such liability by proving an affirmative defense:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile

environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Ellerth, 524 U.S. at 765; see also Faragher, 524 U.S. at 807-08. The Ellerth/Faragher affirmative defense places the burden on the employer by requiring that an employer establish that: (1) it took both preventive and corrective steps to address sexual harassment; and (2) that the employee failed to take advantage of available preventive or corrective measures. See Johnson v. West, Jr., 218 F.3d 725, 731 (7th Cir. 2000) ("Johnson argues that even if the VA was entitled in principle to the Ellerth/Faragher affirmative defense, it did not meet its burden of proof. That burden requires the employer to establish two points, not just one.").

As an appellate court, our review of the jury trial below is limited in nature. See Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1347 (7th Cir. 1995) ("Appellate courts, viewing the sort of claims Penril is now making, must be mindful of their limited role in reviewing factual determinations made by juries and trial judges."). Questions of "credibility and weight of the evidence [are] within the purview of the jury, whose verdict cannot be lightly set aside so long as it has a reasonable basis in the

record." Lippo v. Mobil Oil Corp., 776 F.2d 706, 716 (7th Cir. 1985). With this in mind, we examine Export's contention that it met its burden under the Ellerth/Faragher affirmative defense.

### 1. Preventive Measures Taken by Export

One of the first issues that must be addressed is whether Export had devised an effective sexual harassment policy. For our purposes, the relevant part of the Export policy reads:

Any employee who believes that he or she has been subjected [to] or witness to sexual harassment should immediately report the conduct to the immediate supervisor, division manager, or Human Resource Representative, whichever the employee feels is appropriate, under the circumstances. The incident or behavior will then be referred to the Human Resource Director and a prompt and confidential investigation will be conducted. There will be no reprisals or retaliation of any kind against an employee who brings such an issue before management.

Jennifer Gallagher, who at the time Gentry worked for the company was the Administrative Assistant to the Director of Human Resources, claims she read and explained the policy to Gentry during the latter's initial job orientation. Gentry at trial acknowledged that she was aware of Export's sexual harassment policy. According to Export, its policy was both appropriate and effective and provided for a bypass mechanism around an employee's supervisor. Export contends that its sexual harassment policy provided Gentry with a means to voice her concerns about Broughton's behavior and she chose not to do so.

In an attempt to prevent sexual harassment, there is no dispute that Export implemented a formal sexual harassment policy. "Title VII is designed to encourage the creation of antiharassment polices and effective grievance mechanisms." Ellerth, 524 U.S. at 764. However, a sexual harassment policy must provide for "effective grievance mechanisms" and therefore the mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace. The policy itself should provide for a meaningful process whereby an employee can express his or her concerns regarding an individual within a working environment. Thus, the question then becomes whether Export, with its sexual harassment policy in place, took reasonable care to prevent sexual harassment. See Shaw v. AutoZone, Inc., 180 F.3d 806, 812 (7th

Cir. 1999) (". . . the law does not require success--it only requires that an employer act reasonably to prevent sexual harassment."). In this case, the policy itself raises concerns. During the period in which Gentry worked for Export, management did not post whom they considered to be a Human Resources Representative. John Bauersfeld, the Human Resources Director, acknowledged that he had not told Gentry or any other employee who had assumed the Representative position. This omission is notable because Export's policy provided that an employee could report sexual harassment to a Human Resources Representative. While Gentry was employed at Export, there were five people working in the Human Resources department of the corporate office. Three of these individuals were supervisors, including John Bauersfeld, Jennifer Gallagher, and Vicki Hanske. Gallagher had a baby in early February of 1998 and took four weeks off. She then returned to work part-time until the end of April. Consequently, due to Gallagher's absence and reduced schedule, Gentry, during the months of March and April of 1998, had the option to report her concerns primarily to Bauersfeld and Hanske. Bauersfeld, however, took the position that an employee could only report sexual harassment to himself or Gallagher. In contrast, Broughton testified that it would be proper for an employee to report sexual harassment to Hanske. Fernald, the Chief Financial Officer and Executive Vice President of Export, also said Hanske could be considered a Human Resources Representative and so reporting sexual harassment to her would be appropriate.

Clearly, no consensus existed within the management of the company regarding who assumed the position of Human Resources Representative and Export never informed its employees of who held the position. Such divergence of opinions suggests that Export appears not to have taken the necessary steps to fully and effectively implement its sexual harassment policy. If Export desired its policy to provide a viable means by which an employee could report sexual harassment, then the company should have made it more evident who assumed the Human Resources Representative position. A reasonable jury could have found that such a deficiency in Export's sexual harassment policy reveals that it failed to take appropriate steps to prevent sexual harassment.

2. Gentry's Preventive or Corrective Action

However, even assuming arguendo that Export's policy was construed to be an acceptable one, we conclude that the jury's rejection of Export's position regarding the preventive or corrective

actions Gentry pursued was not unreasonable.

Export argues that Gentry never reported sexual harassment, as she claims, to Vicki Hanske, the Benefits Coordinator at Export. Hanske acknowledged that on two or three occasions she did speak with Gentry about her work related concerns. According to Hanske, Gentry "was upset, thinking that the employees mainly in the corporate office were spreading rumors and making stories up about her." While testifying, Hanske denied that Gentry informed her of any touching or sexual harassment that took place in the office. In addition, Hanske claims Gentry never suggested to her that Broughton was somehow involved in the situation. Basically, Hanske told Gentry that she should develop a thick skin with regard to the stories she believed were being told about her. Hanske contends that she learned about Gentry's sexual harassment allegations, when in response to Bauersfeld's request, she completed a statement discussing any conversations she had with Gentry. In this instance, Hanske said that Gentry would have had to say the term "sexual harassment" for her to report it to Bauersfeld or Gallagher because "[t]here was . . . nothing . . . that I had seen that would have brought me to think there was sexual harassment; otherwise, yes, she would have to say the words because I was not around her area to see anything." Hanske did remark that if Gentry had described events that she believed involved sexual harassment, she would have reported such information to Gallagher or Bauersfeld. Based upon Hanske's testimony, Export advances the proposition that Gentry acted unreasonably by failing to report her allegations of sexual harassment while she still worked at the company.

In addition, Export notes that Gentry consciously decided not to report her allegation of sexual harassment. During the trial, Gentry said "a big reason" she was "really troubled" was that she believed co-workers were talking about her; specifically, that they were saying that she was having an affair. Gentry stated that she never formally used the term sexual harassment because she "was wanting to keep quiet about it so [she] would not get it out in the office and [she] wouldn't lose [her] job." As a consequence, she said she desired to be "discreet" about the situation when talking with Hanske, even though she knew saying the term "sexual harassment" would get a reaction from the person listening to her. Export points out that Gentry's fear does not relieve her of her responsibility to report the sexual harassment. See Shaw, 180 F.3d at 813 ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do

not alleviate the employee's duty under Ellerth to alert the employer to the allegedly hostile environment."). Therefore, Export argues that Gentry's failure to report the sexual harassment to an appropriate individual according to Export's sexual harassment policy was unreasonable.

However, the jury did not accept Export's version of the reporting requirement. Gentry testified that she called Hanske on two separate occasions. During the first conversation, according to Gentry, she told Hanske that she was uncomfortable with some of the discussions in the office and there was a lot of shoulder rubbing, touching, and interoffice dating. Gentry also mentioned that from her perspective one "either had to be dicking one of the bosses or maybe go along with their routines in order to do well in that company." After receiving a hug from Broughton that upset her, Gentry again in late April of 1998 called Hanske and told her that she was "really uncomfortable with the touching and the rubbing and the hugging" in the office and inquired about the possibility of transferring out of the office. Gentry told Hanske that someone she worked frequently and closely with was the source of her problems, and this is when, according to Gentry, that Hanske "knew it was Leo because she actually came up with the name Leo." Hanske responded, Gentry claims, by saying that this was "his personality, that was how he worked. He-had-been-there-for-years type thing. There was really nothing that had ever been done about it and she didn't think that there ever was [going to be anything done.]" While it is true that Gentry never used the term "sexual harassment" when she spoke with Hanske, Bauersfeld said it would not be necessary to employ the term to activate Export's policy. If an employee said he or she was uncomfortable with Broughton's touching and would like a transfer to another department, this comment would be enough, according to Bauersfeld, to establish an employee was complaining about sexual harassment.

We cannot conclude that the jury was unreasonable in believing Gentry's testimony that she did in fact report sexual harassment to Hanske. During oral argument, counsel for Export suggested that even if Gentry had told Hanske that she was concerned about hugging and touching in the workplace, that this type of complaint was not detailed and clear enough to notify Hanske that Gentry was making a sexual harassment complaint. According to counsel, Gentry failed to say that she was being sexually harassed. Export urges the position that a company should not have to surmise an employee's concerns in this area of the law. While certainly not an untenable

position, it must be noted that there is no legal mandate that an employee use the specific term "sexual harassment" in order to inform his or her employer about a harasser in the workplace. Some employees may not be conversant or comfortable with the term and we should not place a specific language requirement on an employee when he or she is already presumably facing a difficult situation. Gentry's comments about touching and hugging in the workplace should have raised suspicions. When an employee complains about behavior, such as the kind described in this case, this should be sufficient to alert an employer about a potential harasser, assuming the proper sexual harassment policy and training are in place. Therefore, we will not disturb the jury's decision, which found wanting Export's Ellerth/Faragher affirmative defense.

B.  Hostile Work Environment

A plaintiff pursuing a hostile work environment claim must show that his or her work environment was both subjectively and objectively offensive; "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal citations and quotation marks omitted). One can determine whether an environment is hostile or abusive "by looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (internal citations and quotation marks omitted).

Export argues that even if it cannot establish its Ellerth/Faragher affirmative defense, the conduct alleged by Gentry against Broughton does not rise to the level of a hostile work environment. Export claims that one female co-

worker of Gentry's testified that she received a hug from Broughton while at Export and did not consider the hug to be sexual harassment. According to this individual, hugs can be "good things" on "[s]tressful days." Likewise, Export notes that male Export employees rubbed the shoulders of at least three female co-workers and these women did not consider this behavior to be sexual harassment. Export claims that such testimonials establish that hugs and shoulder rubs do not create a hostile work environment. Also, Export contends that the conduct Gentry complained of is not severe or pervasive sexual harassment in an objective sense. Export further argues that Gentry herself must not have considered any of the alleged conduct to be sexual harassment because she did not report the conduct until after she no longer was employed by Export and she never used the words "sexual harassment" to describe the conduct until she contacted her attorney. Taken together, Export claims that Gentry never perceived her environment as hostile nor would a reasonable person conclude her working environment was hostile.

Upon our review of the record in this case, we conclude that the jury understandably was not persuaded by Export's position that Gentry failed to make out an objective and subjective claim that her working environment was hostile. It is challenging to precisely define what constitutes a hostile work environment. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (internal citations omitted). Perhaps no single description can fully take into account the divide between a hostile work environment and one which is not. However, in this case, we do have some rather strong indicators that the environment was hostile in that Broughton frequently touched Gentry, he invited her implicitly to have sex with him, and he showed her arguably "off color" pictures. See Baskerville, 50 F.3d at 431. At the time this all happened, Gentry was nineteen years old and Broughton was her thirty-eight year old supervisor. From an objective standpoint, a reasonable person could have concluded that Broughton's behavior constituted sexual harassment.

Subjectively, it is evident that Gentry

perceived her environment as hostile. Gentry told Broughton to stop his behavior and because of his actions she found it hard to concentrate on her work. By the time she left her job, she hated it and often cried when she went to work. A co-worker saw or heard Gentry cry on several different occasions. Gentry also complained about Broughton's behavior to Hanske. She sought medical care and was treated for anxiety and depression caused by the oppressive workplace environment. Finally, a trier of fact could reasonably conclude that the harassment was severe or pervasive because of the frequency of the incidents. At oral argument, Gentry's counsel said that Broughton hugged Gentry with two-armed embraces almost every other working day in March and April, which was the period when most of the hugging occurred. Id. ("The infrequency of the offensive comments is relevant to an assessment of their impact."). When viewed in its totality, it was reasonable for the jury to believe that Gentry worked in a hostile environment because of Broughton's conduct.

C.  Punitive Damages

    Export claims that the district court erred when it submitted to the jury punitive damages instructions. We review jury instructions "essentially for abuse of discretion (though the specific standard for jury instructions cautions us to make sure that the law was fairly stated to the jury)." Molnar v. Booth, 229 F.3d 593, 597 (7th Cir. 2000). For a court to impose punitive damages, "[t]he employer must act with malice or with reckless indifference to [the plaintiff's] federally protected rights. The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999) (internal citations, quotation marks, and emphasis omitted).

    Although Export did not frame the issue as such, it is essentially contending that there was insufficient evidence to find that it acted with malice or reckless indifference with regard to Gentry's Title VII rights. According to Export, Bauersfeld promptly and to the best of his ability investigated Gentry's sexual harassment allegation. Export suggests that it learned of Gentry's sexual harassment complaint when her attorney sent correspondence on May 18 and May 20, 1998 to Bauersfeld concerning the issue. Bauersfeld responded to Gentry's claim of harassment in a May 28 letter, in which he stated that "[t]he only way the company can investigate your allegations of sexual harassment and take

disciplinary action if it is found that sexual harassment has occurred in order to prevent its reoccurrence is for you to first make a charge of sexual harassment under the company's sexual harassment policy." On June 2, Gentry sent a letter to Bauersfeld describing conduct that she asserted was sexual harassment. In this letter, she requested that further contact with her be directed through her legal counsel. Bauersfeld then tried to contact Gentry by telephone at her residence three times and left a message on her answering machine each time. Gentry did not respond to any of Bauersfeld's messages. According to Export, it decided to go ahead with its investigation even though Gentry refused to participate and it issued a written report on June 15, 1998. The investigation occurred over a three day period, during which Bauersfeld spoke to a co-worker, Broughton, and Hanske. Broughton as a result of the investigation received a written reprimand stating: "TOUCHING SHOULD NOT BE DONE TO CO-WORKERS, NO MATTER HOW INNOCENT THE ACTION MAY SEEM. FURTHER ACTIONS COULD RESULT IN FUTURE STEPS." Export contends that it did all it could to investigate and address Gentry's allegations of sexual harassment against Broughton under the circumstances--that is, Gentry's unwillingness to actively participate in the process. Even if Gentry contends she reported the sexual harassment and Export did not respond appropriately, this claim is not viable, according to Export, because it at most shows that Hanske was negligent in failing to recognize Gentry's sexual harassment claim. By contrast, Gentry contends that Export had knowledge of Broughton's behavior and failed to take any action, resulting in her being subjected to sexual harassment by Broughton.

While Export claims it made a good faith effort to address Gentry's concerns, there is evidence that supports a contrary conclusion. Broughton knew that sexual harassment was against the law and that a female employee could consider his conduct to be sexual harassment. He also thought it was common knowledge among some of the management that he hugged female employees at Export. Likewise, management members Fernald, Bauersfeld, and Gallagher were cognizant that sexual harassment was against the law. Despite this recognition, the record supports the assessment that each of these individuals may have failed to address his or her attendant responsibility. Bauersfeld testified that he saw Broughton hug or rub a co-worker's shoulders during the 1997 and 1998 time frame. Broughton had hugged Gallagher and she witnessed Broughton rub an employee's shoulders as well. Broughton testified that he believed that management, particularly Bauersfeld, was aware that he hugged

and rubbed the shoulders of female employees. These hugs involved two-armed embraces. Fernald, second in command at the time, said he saw Broughton give Gentry a shoulder rub between January and May of 1998. Among management, Fernald said that Broughton's behavior of giving shoulder rubs to female employees "wasn't hidden." Fernald overhead a male employee refer to Gentry as Broughton's "sex"retary while she worked for Export and he himself once referred to her by such a name. Bauersfeld said that when he mentioned the "sex"retary comment to Fernald during his investigation of Gentry's complaint, Fernald chuckled. In the early 1990's, Bauersfeld talked to Broughton about his hugging, and rubbing, of female employees' shoulders because he felt that such behavior was "somewhat inappropriate" in the workplace. Another female employee complained in October of 1997 about Broughton's behavior and no action was taken with regard to her complaint. A jury could reasonably conclude that these facts reflect that Export acted with malice or reckless disregard because it had knowledge of Broughton's inappropriate behavior./2 Hence, the district court did not abuse its discretion when it decided to give a punitive damages instruction to the jury.

III.  Conclusion

Because there is a reasonable basis in the record to support the jury's conclusions, the jury award on behalf of Gentry will not be disturbed. Further, we find that the district court judge did not abuse his discretion when he instructed the jury on punitive damages. Therefore, we Affirm the jury's decision finding that Export did not meet its burden under the Ellerth/Faragher affirmative defense and Affirm the award of compensatory and punitive damages.

FOOTNOTES
/1 Neither party suggests that Broughton was not Gentry's supervisor; therefore, we have analyzed Gentry's hostile work environment sexual harassment claim under the supervisor standard of liability set forth in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

/2 In light of the above evidence, we cannot conclude that Gentry's failure to directly participate in the investigation of Broughton somehow hampered Export's efforts to correct the situation. Gentry in her letter did discuss her various concerns regarding the behavior of particular employees at the company. At the end of the letter she said, "The counseling I am receiving is helping yet I also need to continue being removed from the situation so that I may

progress. Any further contact I ask that you please direct through my attorney, Marlita Greve." While we recognize the importance of a company receiving information from the person making a sexual harassment complaint, under these circumstances a face-to-face meeting with the complainant seems less critical.