In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1788

SHANNON KAMPMIER,

*Plaintiff-Appellant,*

*v.*

EMERITUS CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 04 C 50399—**Philip G. Reinhard**, *Judge.*

ARGUED NOVEMBER 3, 2006—DECIDED JANUARY 2, 2007

Before EASTERBROOK, *Chief Judge,* and FLAUM and
WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Emeritus Corporation ("Emeritus") employed Shannon Kampmier as a practical nurse
for six months.[1] Emeritus terminated Kampmier for job
abandonment because she did not call or show up for

---

[1] The captions on both parties' briefs named "Emeritus Assisted Living" and "The Loyalton of Rockford" as defendants.
However, "Emeritus Assisted Living" and "The Loyalton of
Rockford" are merely trade names, which cannot be sued. *See
Schiavone v. Fortune*, 477 U.S. 21, 23 (1986). The proper defendant is Emeritus Corporation.

three of her shifts and failed to provide Emeritus with a doctor's note. Kampmier brought a 10-count complaint against Emeritus including ADA, Title VII, and ERISA claims. Emeritus moved for summary judgment, which the district court granted. Kampmier now appeals. For the following reasons, we affirm in part and reverse in part.

## I. BACKGROUND

Emeritus, an operator of assisted living communities, employed Kampmier as a licensed practical nurse at the Loyalton of Rockford ("the Loyalton"), in Rockford, Illinois from March 2003 until September 2003. During that period, Lynelle Lawson was Emeritus' Regional Director of Operations and Divisional Director of Operations. Lawson oversaw the operations of multiple facilities, including the Loyalton. Michelle See, the Human Resources Director, was responsible for employee relations at the Loyalton and approved the hiring decisions for executive directors and department heads. Lena Badell served as Executive Director of the Loyalton, overseeing the daily operations and the Loyalton's staff. Badell reported directly to Lawson, who hired Badell for her position. During Kampmier's employment, she reported directly to the Director of Nursing. In 2003, three different women held that position: Karen Grover, Jenni Stine, and Valerie Skinner.

## A. Sexual Harassment

Kampmier alleges that Lena Badell, who is a lesbian, made frequent offensive, sexually perverse comments to Kampmier and other women throughout Kampmier's employment. Kampmier alleges that Badell referred to herself as "queer little old me" and made numerous references to being gay. Kampmier also asserts that

Badell made sexually explicit comments such as, "I can turn any woman gay," "I can eat you out," "I eat [my girlfriend] out every night," and "I make [my girlfriend] come every night within the first five minutes." Kampmier further alleges that Badell made jokes about being gay, commented to Kampmier about another female employee's "boobs," and described how she liked them. In addition to the comments, Kampmier claims that Badell grabbed her buttocks thirty times, hugged her fifty to sixty times, grabbed her around the arms, jumped in her lap ten times, kissed her on the cheek, and rubbed up against her during Kampmier's employment at the Loyalton.

Emeritus' employee handbook, which was in effect during Kampmier's employment, outlined a harassment prevention policy that advised employees to report harassment or discrimination to their immediate supervisors, the executive director, the business office director, or any member of Emeritus' management team. Under the policy, if a complaint was reported to management, Emeritus was required to perform an investigation and subsequently inform the aggrieved employee of the outcome of the investigation. Kampmier contends that she complained about Badell's behavior to Badell, Grover, and Stine. Grover says that she reported Kampmier's claims to Lawson, but Lawson denies ever receiving them. Emeritus did not discipline Badell while at the Loyalton.

## B. Kampmier's Endometriosis

Kampmier suffers from endometriosis, a condition where tissue similar to the lining of the uterus (the endometrial stroma and glands, which should only be located inside the uterus) is found elsewhere in the body. She was diagnosed when she was 16 years old and has had an average of one to two surgeries a year since that time,

including fifteen laparoscopic surgeries and cervical scrapings. As a result of the endometriosis, Kampmier had pregnancy complications with both of her children. She also had an ectopic pregnancy in 2000. Kampmier's endometriosis flares up a week or two before and after her menstrual cycle, during painful periods, and for a month and a half after surgery. For two weeks after her surgery in 2003, Kampmier had difficulty walking, cleaning her house, caring for her child, engaging in sexual inter-course or driving (she was on Vicodin). When Emeritus hired her, Kampmier did not indicate that she required accommodation for any physical impairment and did not inform Emeritus of her condition. Kampmier did not take off any time from work for illness between March and late-August 2003.

### C.  Kampmier's Termination

In 2003, Kampmier was scheduled to work on Friday, August 29 and Monday, September 1, which was Labor Day weekend. On Thursday, August 28, 2003, Kampmier went to her physician, Dr. Higgins, because she was in pain. He recommended that Kampmier have a hysterec-tomy to correct her endometriosis. Dr. Higgins informed Kampmier that he would have someone contact her on Monday, September 1, or Tuesday, September 2, to set up the hysterectomy. In the interim, he instructed her to take off work.

After speaking with Dr. Higgins, Kampmier called Badell at home to cancel her Friday and Monday shifts. Kampmier told Badell that she might need a hysterec-tomy and that it would be scheduled as soon as possible. Badell said that was fine and that Badell had recently undergone a hysterectomy and knew exactly what Kampmier was going through.

On Friday, August 29, Badell contacted Kampmier and requested a doctor's note.[2] Kampmier called Dr. Higgin's office and spoke with his office nurse who told Kampmier that the doctor was out of the office. Kampmier asked the nurse to call Badell; however, Badell never received a phone call or a note and Kampmier never followed up with the doctor, Badell, or the nurse.

On September 2, Kampmier called Badell and informed her that surgery was scheduled and she would need some time off, indicating that it might be two weeks, three weeks, or eight weeks depending on whether she had a hysterectomy or laparoscopic surgery.

Later that day, Badell and Skinner called Kampmier's home. Kampmier's mother answered and told Badell and Skinner that Kampmier was sleeping. Badell and Skinner asked Kampmier's mother to tell Kampmier that she needed to send a doctor's note to the Loyalton. Badell testified that she made the phone call because another nurse claimed to have seen Kampmier at a Labor Day parade. Kampmier's mother promised that Kampmier would call the Loyalton as soon as Kampmier woke up. Kampmier did not return Badell's phone call.

On September 5, several hours after the beginning of Kampmier's scheduled shift, Kampmier called Badell and told Badell she was having surgery that evening. She told Badell that she would be back at work in two weeks. Kampmier did not come to work or call in for her shifts on September 6-8. Badell and Skinner contacted Kampmier's doctor's office and asked that the office fax a note, but they never received one. Badell and Skinner then con-tacted Lawson and informed her of the situation. Lawson

---

[2] Emeritus' attendance policy provides that an employee who is absent two or more days may be required to bring in a doc-tor's note upon return to work.

told them to speak with the human resources director, Michelle See, to discuss the process to follow.

Skinner told See that Kampmier was not showing up for her scheduled shifts and had failed to provide Emeritus with a doctor's note. Together, See, Skinner, and Badell reviewed the facts, the schedule, and Emeritus' attendance policy, which provides, "If an employee is unable to report to work[,] they are required to contact their supervisor a minimum of two hours prior to the start of their shift." The attendance policy also states in bold capital letters, "A no-call, no-show is grounds for immediate termination." On September 8, 2003, Badell spoke separately by telephone with See and Lawson, and the three agreed to terminate Kampmier for job abandonment because she did not report or call in for her scheduled shifts and because she failed to provide Emeritus with a doctor's note.

Kampmier received a letter, dated September 8, 2003, stating that Emeritus interpreted her failure to call or show up for work as voluntary resignation. Kampmier complained about her termination to both See and Lawson, neither of whom would reinstate her. In her phone call with See, Kampmier complained that Badell had sexually harassed her. After speaking to Kampmier, See informed both Lawson and Badell about the allegations, which Badell denied.

On September 23, 2004, Kampmier filed a ten-count complaint against Emeritus in the Northern District of Illinois. Kampmier brought disparate treatment (Count I), reasonable accommodation (Count II), and retaliation claims (Count III) under the ADA; disparate treatment (Count IV), sexual harassment (Count V), and retaliation claims (Count VI) under Title VII; an ERISA claim; and state law claims for negligent hiring, negligent training and supervision, and intentional infliction of emotional distress.

On August 8, 2005, Emeritus filed a motion for summary judgment. On February 15, 2006, the district court granted the motion on counts I-VII of Kampmier's complaint. The district court also declined to assert jurisdiction over the remaining state law claims.

## II. ANALYSIS

This Court reviews a district court's entry of summary judgment de novo. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004). Summary judgment is inappropriate if there is a genuine issue of material fact. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). To survive summary judgment, the non-moving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. ADA

### 1. Disability Discrimination

Kampmier first claims that the district court erred by granting summary judgment on her ADA discrimination claim. Because she does not have direct evidence of disability discrimination, she must proceed on the basis of the indirect burden-shifting method of proof. *See Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 792 (7th Cir. 1997). To make a prima facie case of disability discrimination at the summary judgment phase, a plaintiff must offer evidence that: 1) she is disabled within the meaning of the ADA, 2) she was meeting her employer's legitimate employment expectations, 3) she was subject to an adverse employment action, and 4) similarly situated employees received more favorable treatment. *Rooney v. Koch*

*Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005). Both parties agree that Kampmier was meeting Emeritus' legitimate employment expectations, and, for purposes of appeal, Emeritus concedes that it terminated Kampmier. Thus, the parties only dispute the first and fourth prongs of Kampmier's prima facie case.

### a. Disability

An individual can prove that she is disabled under the ADA by establishing that: 1) she has a physical or mental impairment that substantially limits one or more major life activities, 2) she has a record of such an impairment, or 3) she is regarded as having such an impairment by her employer. 42 U.S.C. § 12102(2)(A).

Kampmier has not proven that she has a physical or mental impairment that substantially limits one or more major life activities. "Substantially limits" means that Kampmier is unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). In deciding whether a person is disabled, we consider "the nature and severity of the impairment, the duration and expected duration of the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii); *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 451 (7th Cir. 2001).

Kampmier testified that she cleans her own house, cooks on a regular basis, plays with her children, takes her daughter to Gymboree, swims, and does her own grocery shopping. She has no difficulty brushing her teeth, bath-

ing, combing her hair or dressing herself. She claims that in the two weeks following her September 5, 2003 surgery she could not lift anything and could not drive as often because she was taking Vicodin. She alleges that she does not do any gardening or lawn mowing, but does not allege that her failure to do these activities has anything to do with her endometriosis. She had two natural pregnancies and engaged in sexual intercourse both before and after her 2003 surgery.

Moreover, Kampmier is not limited in her ability to work. It is undisputed that she did not take off any time because of her endometriosis before August 28, 2003, and she regularly worked 16-hour shifts. Although endometriosis is undoubtedly painful, in this case it does not rise to the level of disability under the ADA. Kampmier's own testimony leaves no doubt that she is able to perform the tasks central to most people's lives, and this dooms her claim that she is suffering from a disability cognizable under the ADA. *See Rooney*, 410 F.3d at 381.

Kampmier cites to a district court case for the proposition that courts have recognized endometriosis as a disability. *See Erickson v. Bd. of Governors of State Colls. & Univs. for Ne. Ill. Univ.*, No. 95 C 2541, 1997 WL 548030 (N.D. Ill. Sept. 2, 1997). However, the district court in *Erickson* actually found the plaintiff's disability to be infertility, not endometriosis. *Id.* at *4. Kampmier has two children by natural means, and thus, *Erickson* is not on point.

Kampmier also cites *Bragdon v. Abbott* in which Chief Justice Rehnquist, concurring in part and dissenting in part, stated in dicta that "there are numerous disorders of the reproductive system, such as . . . endometriosis, which are so painful that they limit a woman's ability to engage in major life activities such as walking or working." 524 U.S. 624, 660 (1998). However, whether or not

a medical condition rises to the level of a disability is to be made on an individualized case-by-case basis. *Sutton v. United Airlines, Inc.* 527 U.S. 471, 483 (1999). Here, Kampmier has not offered evidence that her endometriosis limited her ability to engage in major life activities.

Nor has Kampmier offered evidence that she has a record of a disability. To succeed under this theory, Kampmier must again show that her impairment substantially limits one or more major life activities. 29 C.F.R. § 1630.2(k); *Rooney*, 410 F.3d at 381. As demonstrated above, however, Kampmier did not submit evidence to this effect. Instead, she claims that she had a long record of problems with reproduction, including one ectopic pregnancy, three failed in vitro procedures, and six failed artificial inseminations. We have held that an employer's possession of records detailing injuries and surgeries does not mean that the employee is statutorily disabled. *Rooney*, 410 F.3d at 381. Moreover, Kampmier does not even claim that Emeritus had a record of her prior surgeries or procedures.

Finally, Kampmier has not offered evidence suggesting that Emeritus regarded her as disabled. If "the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute." *Mack v. Great Dane Trailers*, 308 F.3d 776, 782 (7th Cir. 2002). Kampmier has provided no evidence that Emeritus thought she was unable to perform the functions of her job as a registered nurse. Emeritus never limited Kampmier's responsibilities even after they learned she had endometriosis. Kampmier suggests that Badell considered her unable to work because she called Badell and told her that she was unable to work on August 29 and September 1. However, Kampmier has not offered evi-

dence that Badell considered her unable to work because of an impairment that substantially limits a major life activity.

### b.   Similarly Situated Individuals

Under the fourth prong of the prima facie case, Kampmier is required to identify a similarly situated individual who received more favorable treatment. However, Kampmier has not identified any similarly situated individuals at Emeritus. In fact, she does not mention the words "similarly situated" with regard to her ADA claims in either her opening or reply brief. Because Kampmier is not disabled and failed to identify a similarly situated individual who Emeritus treated differently, the district court properly granted Emeritus' motion for summary judgment.

### 2.   Failure to Accommodate and Retaliation

Because Kampmier has not offered evidence that she is disabled within the meaning of the ADA, her ADA failure to accommodate and retaliation claims are without merit.

## B.  Title VII

### 1.  Gender Discrimination

Kampmier claims that she offered direct evidence of sex discrimination. A plaintiff may prove discrimination using the direct method by establishing either an acknowledgment of discriminatory intent or circumstantial evidence that provides the basis for an inference of intentional discrimination. *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006). With regard to her direct method

proof, Kampmier makes one conclusory statement that her "termination would not have occurred but for her endometriosis, a condition that is inherently female, just like pregnancy." This bare assertion is insufficient to establish discrimination under the direct method. The only "proof" that Kampmier has is the fact that she had endometriosis and was terminated. Temporal proximity, alone, is not enough to establish discriminatory intent. *Bilow v. Much Shelist Freed Deneber Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second.").

Kampmier also alleges that she made a showing of sex discrimination under the indirect method of proof. Under the indirect method of proof, a plaintiff must demonstrate that 1) she was a member of a protected class, 2) she was meeting her employer's legitimate business expectations, 3) she suffered an adverse employment action, and 4) her employer treated similarly situated employees outside of the class more favorably. *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). Although Kampmier satisfies the first three prongs of the indirect proof test, she fails to identify any similarly situated male employees who Emeritus treated more favorably. Kampmier states that "there is no evidence in this case anyone else was terminated at this time but Kampmier." This does not adequately satisfy Kampmier's burden of producing a similarly situated individual who Emeritus treated differently. Accordingly, Kampmier cannot demonstrate a prima facie case of sex discrimination under Title VII.

## 2. Retaliation

Under Title VII, unlawful retaliation occurs when an employer takes actions that "discriminate against" an

employee because she has opposed a practice that Title VII forbids. *Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2410 (2006). The Supreme Court has held that an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. *Id.* at 2412. A plaintiff has two means of proving Title VII retaliation: the direct method and the indirect method. *Logan v. Kautex Textron N.A.*, 259 F.3d 635, 638-39 (7th Cir. 2001). In support of her claim that there is direct evidence of Title VII retaliation Kampmier states that she "established [that] she complained about sexual harassment by Badell, and subsequently she was terminated." Although the second type of evidence permitted under the direct method is circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker, *Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759, 762 (7th Cir. 1997), timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Kampmier claims to have complained to Grover about Badell in April or May 2003, yet she was not terminated until September 2003. Kampmier has provided no evidence that her complaint to Grover about Badell played any part in the decision to terminate her.

In *Stone v. City of Indianapolis*, this Court enunciated a new rule for proving retaliation under the indirect method. 281 F.3d 640 (7th Cir. 2002). Under *Stone*, "a plaintiff must show that after filing the [complaint of discrimination] only [s]he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [s]he was performing [her] job in a satisfactory manner." *Id.* at 644. Kampmier has not identified a similarly situated individual; thus, her retaliation claim cannot withstand summary judgment.

**3.  Sexual Harassment**

Kampmier next claims that the district court erred by granting summary judgment on her same-sex sexual harassment claim. To establish a prima facie case, Kampmier must show that 1) she was subjected to unwelcome harassment, 2) the harassment was based on her sex, 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and 4) there is a basis for employer liability. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002). Because Kampmier has raised genuine issues of material fact under each prong of her prima facie case, the district court erred by granting summary judgment.


a.   Unwelcome Harassment

The first question is whether a reasonable jury could find that Badell's allegedly harassing behavior was unwelcome. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). Kampmier testified that Badell's obscene comments and constant physical contact made her uncomfortable. She complained about Badell's behavior on three separate occasions, which was confirmed by Grover. Grover testified that she complained on numerous occasions to Emeritus' corporate office, specifically Lawson, but the response was always that they did not want to hear about it. Emeritus contends that Kampmier engaged in sexual banter herself; however, it did not point to any evidence in the record that Kampmier encouraged the alleged behavior or welcomed it in anyway. Accordingly, Kampmier has raised a genuine issue of material fact about whether Badell subjected her to unwelcome harassment.

b. Because of Sex

Emeritus argues that Badell's harassment was not because of Kampmier's sex, because Badell harassed both sexes, making her an "equal opportunity harasser." *Holman v. Ind. Dept. of Transp*, 211 F.3d 399, 403 (7th Cir. 2000). Emeritus introduced evidence that Badell had grabbed two male employees' buttocks and that Badell and a male employee made plans to have dinner one night. After the male employee decided not to meet with Badell, she said to him, "I was waiting and ready for you. If you did not want it and did not want to be bothered by me, then you should have said something." The male employee testified that he assumed this was a sexual proposition.

However, the harassment that Kampmier allegedly endured was far more severe and prevalent than the alleged conduct endured by the male employees. Kampmier alleged that Badell made constant references to female employees at the Loyalton, made comments about their "boobs," and told the women at the Loyalton that she could turn any woman gay. Yvonne Peterson, another Emeritus employee, also testified that she heard Badell claim to be able to turn any woman gay. At the least, Kampmier has raised a genuine issue of material fact as to whether Badell's alleged harassment was because of Kampmier's sex.

c. Offensive Harassment

To prove that her work environment was hostile, Kampmier must demonstrate that it was both objectively and subjectively offensive. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). Courts look to several factors to determine whether alleged harassment is objectively offensive, including the frequency of the

conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000). The "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

This Court has on many occasions distinguished between harassing and merely objectionable conduct. *See, e.g.*, *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463-64 (7th Cir. 2002) (holding that plaintiff's allegations that a supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a sufficient inference of a hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that plaintiff's complaints of eight gender-related comments during the course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," was insufficient to demonstrate a hostile work environment); *Adusumilli v. City of Chi.*, 164 F.3d 353, 361-62 (7th Cir. 1998) (holding that plaintiff's complaints of teasing; ambiguous comments about bananas, rubber bands, and low-neck tops; staring and attempts to make eye contact; and four isolated incidents where a co-worker briefly touched her arm, fingers, or buttocks did not constitute sexual harassment). In short, minor or isolated incidents are generally insufficient to rise to the level of objectively offensive conduct.

By contrast, sustained physical contact can raise otherwise merely objectionable conduct to the level of objectively

offensive conduct. For instance, in *King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533, 535 (7th Cir. 1990), this Court concluded that the defendant's conduct rose to an objectionable level when he followed the plaintiff into a bathroom at an office holiday party, telling her that he "had to have her" and that "he would have her." Despite the plaintiffs protests, the defendant forcibly kissed and fondled her, stopping when the plaintiff's boyfriend came into the bathroom. *Id.* Similarly, in *Gentry v. Export Packaging, Co*, 238 F.3d 842 (2001), this Court held that the defendant's constant physical contact with the plaintiff to be objectively offensive. In that case, the defendant invited the plaintiff implicitly to have sex with him and showed her arguably "off color" pictures. Moreover, the defendant hugged the plaintiff "with two-armed embraces" almost every other working day for two months. *Id.* at 850-51.

Here, Kampmier estimated that during her employment at the Loyalton, Badell hugged her fifty to sixty times, jumped in her lap ten times, touched her buttocks thirty times, and made the comment that she could turn any woman gay ten to twelve times. Kampmier also alleged that Badell stated that she "make[s] Carol (her girlfriend) come every night within the first five minutes" and also commented that she could perform the same act on Kampmier. Based on the sustained nature of the physical contact, combined with Badell's sexually explicit remarks, a jury reasonably could find Badell's comments and her physical contact with Kampmier objectively offensive.

It is not enough for Kampmier to establish the objectively offensive nature of Badell's harassment; she must also raise a genuine issue of material fact that the harassment was subjectively offensive. *Rhodes*, 359 F.3d at 505. The district court held that "the undisputed overwhelming evidence established that Kampmier did not perceive her work environment to be hostile until after she

received her termination letter in early September." *Kampmier v. Emeritus Assisted Living, et al.*, No. 04 C 50399, slip op. at 2 (N.D. Ill. Feb. 15, 2006).

The parties agree that Kampmier allowed Badell's lover to babysit her daughter in Badell's home, visited Badell in the hospital after Badell's surgery, gave Badell a card, spent time with Badell's son, and on at least one occasion provided medical assistance to Badell's mother. This evidence seems to belie Kampmier's claim that she felt harassed by Badell. Nonetheless, Kampmier did complain to three different supervisors as required by Emeritus' attendance policy. She repeatedly told Badell to "knock it off" when Badell engaged in the alleged harassment. When Badell did not stop her behavior, Kampmier complained to Grover. Finally, after Grover left (apparently because of Badell's behavior), Kampmier complained to Stine, Grover's replacement.

In *Gentry*, this Court held that the plaintiff provided sufficient evidence that the alleged harassment was subjectively offensive, where the plaintiff found it hard to concentrate on her work because of the defendant's actions. She hated her job and often cried when she went to work. A coworker saw or heard the plaintiff cry on several different occasions. The plaintiff also sought medical care and was treated for anxiety and depression caused by the oppressive workplace environment. 238 F.3d at 851. While Kampmier has not offered evidence that she cried before coming to work or sought medical care, the Supreme Court has emphasized that "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). Kampmier's repeated complaints regarding Badell's harassment are sufficient to raise a genuine issue of material fact as to whether she found Badell's harassment subjectively offensive.

### d.  Employer Liability

Finally, Kampmier must prove that there is a basis for employer liability. An employer may be vicariously liable to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *See* Fed. R. Civ. P. 8(c); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). The defense comprises two necessary elements: 1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and 2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.* No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.*

In this case, Badell's alleged harassment did not culminate in Kampmier's termination. As discussed above, Kampmier simply provides no evidence that Badell's alleged harassment had anything to do with her termination. As a result, Emeritus may raise an affirmative defense to Kampmier's allegations of harassment. Grover testified that she contacted Lawson several times and complained about "certain things Lena was doing that negatively impacted the workplace . . . ." She also testified that Lawson "did not want to hear about it." In addition, Kampmier testified that Badell was not disciplined during Kampmier's employment, even though Kampmier complained to three different individuals about the harassment. This evidence is sufficient to create a genu-

ine issue of material fact with regard to whether Emeritus exercised reasonable care to prevent and correct Badell's behavior.

## C. ERISA

Finally, Kampmier claims that she raised an issue of fact as to whether her termination was based on her eligibility for ERISA benefits. To recover under ERISA § 510, Kampmier must demonstrate that 1) she is a member of an ERISA plan, 2) she was qualified for the position, and 3) she was discharged under circumstances that provide some basis for believing that Emeritus intended to deprive her of benefits. *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir. 1994). Both parties agree that Kampmier was a member of an ERISA plan and that she was qualified for her position. Thus, the only issue is whether Kampmier was discharged under circumstances that provide some basis for believing that Emeritus intended to deprive her of benefits.

Kampmier claims that although her termination letter was dated September 8, 2003, her COBRA election document stated the "event date" as August 28, 2003, the same day that Kampmier sought treatment for her endometriosis. As a result, Kampmier claims that Emeritus rejected thousands of dollars of Kampmier's medical bills. However, Emeritus explains that it back-dated Kampmier's termination date because under the terms of its plan with Employees Benefit Management Systems, a third party administrator, coverage for Emeritus' employees' medical, prescription, dental and vision insurance ends on the last day of the pay period on or after the last day worked. Because Kampmier does not challenge Emeritus' explanation, the district court properly entered summary judgment in Emeritus' favor.

### III. CONCLUSION

For the above stated reasons, we AFFIRM in part and REVERSE in part the judgment of the district court. We REMAND Count V.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*