In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1009

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellant*,

*v.*

V & J FOODS, INC., *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-194—**Rudolph T. Randa**, *Chief Judge*.

———————

ARGUED SEPTEMBER 12, 2007—DECIDED NOVEMBER 7, 2007

———————

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The district court granted summary judgment for the defendant, the owner of a Burger King restaurant in Milwaukee, in this suit by the EEOC charging two forms of sex discrimination in violation of Title VII: the creation of a hostile working environment for women, and retaliation for opposing such discrimination.

The defendant had hired a high-school student named Samekiea Merriweather to work at the restaurant after

school and on weekends. She had recently turned 16 and this was her first paying job. The general manager of the restaurant was a 35-year-old bachelor named Tony Wilkins. Wilkins was having sexual relations with several of the female employees at the restaurant and he began making suggestive comments to Merriweather. He would also rub against her and try to kiss her. She rebuffed his advances but he persisted. She felt as though she were working with "a stalker all around." He told her he wanted "a young girl" because of "their body. You know, it's not all used up." Later he said "I want to take you to the hotel. You can have anything you want. I'll pay you what, 5-, $600." When she said she wasn't interested in him, that she had a boyfriend, he told her that "he was tired of doing things for me and he [wasn't] going to do [anything] else for me because I'm sitting here giving my body away for free when he's trying to pay me." At this point he turned hostile to her. Eventually he fired her, ostensibly though implausibly because she missed an afternoon of work (she had been scheduled to work that morning, and he altered the work schedule without notifying her). But later he rehired her, and the harassment continued.

She complained repeatedly to the shift supervisors (junior managers in fast-food restaurants, *Doe v. Oberweis Dairy*, 456 F.3d 704, 717 (7th Cir. 2006)), and to the assistant manager of the restaurant (Wilkins's number 2), all to no avail. She asked the assistant manager for a phone number that she could call to complain about sexual harassment. He told her he didn't know whether he could give her the phone number and that he wasn't even sure there was such a number. He did give her a number eventually, but it was a wrong number and when she pointed this out to him he said, "Well, I don't know then."

Merriweather's mother came to the restaurant and complained to a shift supervisor named McBride about Wilkins's sexual harassment of her daughter. Wilkins was not present. McBride professed ignorance of the matter and reported the mother's intervention to Wilkins as soon as he returned—whereupon he fired Merriweather, this time for good, on the ground that she had involved her mother in the matter rather than handling it "like a lady."

We were astonished when V & J's lawyer told us at argument that Wilkins's conduct toward Merriweather was not sexual harassment, though in his brief he had acknowledged that it was. We hope V & J, the owner of numerous fast-food restaurants, knows better. The main grounds on which the district court dismissed the suit were not that Merriweather had not been harassed on grounds of sex but, first, that she had failed to invoke the company's procedure for complaining about harassment, and, second, that firing her because of her mother's intervention was not actionable retaliation for "oppos[ing] any practice made an unlawful employment practice" by Title VII, 42 U.S.C. § 2000e-3(a), because it was "third-party retaliation." The term refers confusingly to retaliation against the victim of discrimination because someone else opposed the discrimination.

The judge also thought that the plaintiff had failed to raise a triable issue of whether the reason given for her first discharge—her failure to show up in the afternoon after her work schedule was changed without her being notified—was spurious and whether her second discharge was partly in retaliation for her own opposition to Wilkins's misconduct, as distinct from her mother's opposition. These two determinations were simply wrong.

The evidence was conflicting; the judge made the mistake of trying to resolve genuine issues of material fact on summary judgment.

With regard to the first of the two main grounds of the judge's decision, an employer can avoid liability under Title VII for harassment (on a ground, such as sex, that constitutes a form of discrimination that the statute forbids) of one of his employees by another by creating a reasonable mechanism by which the victim of the harassment can complain to the company and get relief but which the victim failed to activate. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). If the harasser is a supervisor and the harassment takes the form of firing or taking other employment action against the victim, the employer's liability is strict, *id.*; *Faragher v. City of Boca Raton*, *supra*, 524 U.S. at 808, and that principle is applicable to the two firings of which Merriweather complains. The presence or absence of an adequate complaint machinery is relevant only to her claim for damages for the harassment that she suffered while she was employed by the defendant, and not to her claim of having been unlawfully fired.

The mechanism must be reasonable and what is reasonable depends on "the employment circumstances," *id*. at 765; see *Wilson v. Tulsa Junior College*, 164 F.3d 534, 541-42 (10th Cir. 1998), and therefore, among other things, on the capabilities of the class of employees in question. If they cannot speak English, explaining the complaint procedure to them only in English would not be reasonable. In this case the employees who needed to be able to activate the complaint procedure were teenage girls working in a small retail outlet. V & J's lawyer surprised us

a second time by telling us that an employee's age and education are irrelevant to the adequacy of the grievance machinery established by the employer—if it is a machinery within the competence of a 40-year-old college graduate to operate, it will do for a 16-year-old girl in her first paying job. An employer is not required to tailor its complaint procedures to the competence of each individual employee. But it is part of V & J's business plan to employ teenagers, part-time workers often working for the first time. Knowing that it has many teenage employees, the company was obligated to suit its procedures to the understanding of the average teenager. Cf. *Doe v. Oberweis Dairy*, *supra*, 456 F.3d at 717. Here as elsewhere in the law the known vulnerability of a protected class has legal significance. Cf. *Evory v. RJM Acquisitions Funding L.L.C.*, Nos. 06-2130 *et al.*, 2007 WL 3071678, at *3 (7th Cir. Oct. 23, 2007); *United States v. Grimes*, 173 F.3d 634, 638 (7th Cir. 1999).

Ignoring this point, the company adopted complaint procedures likely to confuse even adult employees. The employee handbook that new employees are given has a brief section on harassment and states that complaints should be lodged with the "district manager." Who this functionary is and how to communicate with him is not explained. The list of corporate officers and managers at the beginning of the handbook does not list a "district manager," or for that matter a "general manager," but instead a "restaurant manager"; and there is evidence that employees confuse "district manager" with "restaurant [or general] manager"—that is, Wilkins, the harasser. There is a phone number on the cover of the handbook, and if you call it you get a receptionist or a recorded message at V & J's headquarters. But an employee would

not know whom to ask for at headquarters because she is not told who her district manager is or the district of the restaurant at which she works.

If an employee complains to a shift supervisor or assistant manager, that person is supposed to forward the complaint to the general manager (and thus in this case to Wilkins) even if the complaint is *about* the general manager. After receiving the complaint the general manager is supposed to "turn himself in," which of course Wilkins did not do. Nor did the shift supervisors or assistant manager report Merriweather's complaints to Wilkins or to anyone else. A policy against harassment that includes no assurance that a harassing supervisor can be bypassed in the complaint process is unreasonable as a matter of law. *Faragher v. City of Boca Raton*, *supra*, 524 U.S. at 808-09; see also *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349-50 (6th Cir. 2005).

The pay statements that the defendant's employees receive with their salary checks contain a company "hotline" number different from the number on the cover of the employee handbook. The pay statement says that the number is to be used if the employee wants to "comment" about the company. A complaint is not well described as a "comment"; an employee might think the hotline number was like a suggestion box. Also, it is unclear whom you reach if you call that number. And the number appears in an inconspicuous place on the pay statement and Wilkins himself testified that he did not know how to find it.

Were it costly for an employer to provide a clearer path for complaints about harassment, the cost would have to be weighed against the benefits, the latter being measured presumably by the increase in meritorious

complaints that the clearer procedure would generate and the resulting reduction in workplace harassment. An unreasonably costly complaint mechanism would not be reasonable. But it would cost very little, certainly for a company of V & J's size, to create a clear path for complaints of harassment and other forms of illegal discrimination. Its home page describes the company as "one of the largest restaurant franchise companies in the country." www.vjfoods.com/about.html (visited Sept. 13, 2007). All that it would have to do, we should think, would be to post in the employees' room (thus not visible to the restaurant's customers) a brief notice that an employee who has a complaint about sexual harassment or other misconduct can call a toll-free number specified in the notice. The number would ring in the office of a human relations employee and the receptionist would identify the office as that of the company's human relations department. Given V & J's size, it must have a number of human relations personnel.

Of course the suggested procedure would add to the company's costs, because its human relations department would be processing more complaints. But the cost increment would probably not be great and in the long run it might be trivial or even negative, since, as word of the existence of an effective complaint procedure spread, the amount of harassment would decline. In any event, the defendant has the burden of proving that it has established and implemented an effective complaint machinery—it is an affirmative defense, *Faragher v. City of Boca Raton*, *supra*, 524 U.S. at 807-08; *Burlington Industries, Inc. v. Ellerth*, *supra*, 524 U.S. at 765—and V & J has presented no evidence at all about the cost of adopting and administering an effective complaint machinery.

Merriweather's claim of retaliation also was dismissed prematurely. But to see this one must distinguish among several cases of third-party harassment. The first is where a stranger to an incident of harassment—probably a fellow employee, but functionally a bystander—complains to the employer about the harassment and the company responds by firing the employee in annoyance at the stranger's intervention. The statute forbids "an employer to discriminate against any of its employees or applicants for employment . . . because he has opposed any practice" that violates the statute or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the statute. 42 U.S.C. § 2000e-3(a). The stranger (as we are calling him) in our example is not a victim of discrimination (he may not even be an employee), while the victim of discrimination is not the person who opposed the unlawful practice. So the victim would not have a remedy for the retaliation. (The stranger would, if he were an employee and was fired for assisting the victim to press a charge.)

At the opposite extreme is the case in which the victim of harassment either is represented by a lawyer and it is the lawyer who expresses to his client's employer the client's opposition to being harassed, cf. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989), or, as in this case, in which the victim is a minor and the "opposer" is the minor's parent or guardian. The right to sue for retaliation because you were fired (or otherwise discriminated against) as a result of your lawyer's having assisted you in opposing discrimination is implicit in the second clause of the retaliation provision, relating to the bringing of a charge or other litigation-related activity, normally

handled by one's lawyer. But the parent-guardian case is no less clear and was held in *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471 n. 10 (4th Cir. 1999), albeit in a footnote, to permit a claim on behalf of the child for retaliation.

People often act through agents, such as lawyers; and minors, especially because of their legal and functional incapacities, *must* act through agents in any legal matter, and their agents are their parents or guardians. Merriweather could not have sued V & J on her own. And if she sued by her "next friend" (her mother), as authorized by Fed. R. Civ. P. 17(c) and illustrated by such cases as *Black v. North Panola School District*, 461 F.3d 584 (5th Cir. 2006); *Gant ex rel. Gant v. Wallingford Board of Education*, 195 F.3d 134 (2d Cir. 1999), and—the case directly on point—*Baird*, and was fired in retaliation, it would be absurd to think that she had not been fired for *her* opposition to the company's mistreatment of her. Merriweather's mother acted as her daughter's agent in confronting Wilkins about the sexual harassment of her daughter. In retaliating against Merriweather for her mother's intervention, Wilkins was retaliating against the principal, her daughter, just as if Merriweather's lawyer had complained to Wilkins about Wilkins's harassing his client and he had responded by firing Merriweather.

The intermediate case between what we are calling the stranger case on the one hand, and the lawyer or parent/guardian case on the other, is where the employee is "represented" in an informal sense, usually by another employee. The "representative" is a kind of ad hoc agent, and the courts are divided over whether retaliation against the employee because of the opposition to harassment manifested by his "representative" is actionable. Compare *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 564 (3d Cir.

2002), and *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998), both implying that such retaliation is not actionable by the principal, with *Holt v. JTM Industries, Inc.*, 89 F.3d 1224, 1227 n. 2 (5th Cir. 1996), and *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545 (6th Cir. 1993), both holding that it is. This court has not expressed itself on the matter, and we need not do so in this case.

But we must consider whether Merriweather's mother, because she was her daughter's agent, should be charged with failing to activate the company's complaint procedure; perhaps she should have pursued the procedure that stumped her teenage daughter. But that would be carrying the agency analysis too far. It would impose on the daughter the duty of showing the mother the employee handbook and on the mother the duty of puzzling out how to convey a complaint of sexual harassment by her daughter's supervisor to the district manager for the daughter's restaurant. The mother is not a lawyer and cannot reasonably be expected to have done more than she did—remonstrate with her daughter's supervisor.

The judgment is reversed and the case remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

A true Copy:

      Teste:

                          _____

                          *Clerk of the United States Court of*
                               *Appeals for the Seventh Circuit*