In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3247

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellee,*

*v.*

MANAGEMENT HOSPITALITY OF RACINE,
INC. d/b/a INTERNATIONAL HOUSE OF PANCAKES,
FLIPMEASTACK, INC. and SALAUDDIN
JANMOHAMMED,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06-cv-0715—**Lynn S. Adelman,** *Judge.*

ARGUED APRIL 5, 2011—DECIDED JANUARY 9, 2012

Before EASTERBROOK, *Chief Judge*, BAUER, *Circuit Judge*,
and YOUNG, *District Judge*.[*]

[*] The Honorable Richard L. Young, Chief Judge of the United
States District Court for the Southern District of Indiana, sitting
by designation.

YOUNG, *District Judge*. The Equal Employment Opportunity Commission ("EEOC") brought this action on behalf of two servers, Katrina Shisler and Michelle Powell, who were employed at an International House of Pancakes franchise in Racine, Wisconsin (the "Racine IHOP"), alleging that the servers were sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. A jury found in favor of Shisler and Powell on the hostile work environment claim, and against the Defendants, Management Hospitality of Racine, Inc. ("MHR") d/b/a International House of Pancakes, Flipmeastack, Inc., and Salauddin Janmohammed. The jury awarded compensatory damages to Shisler and Powell, and awarded punitive damages to Powell.

Following the jury verdict, the EEOC filed a document entitled EEOC's Post-Trial Motions that addressed two motions: a motion for judgment against Defendants Flipmeastack and Salauddin Janmohammed and a motion for an order of injunctive relief. The Defendants filed a Motion for Judgment as a Matter of Law or Alternatively for a New Trial or Remittitur. By Decision and Order dated August 31, 2010, the district court denied the Defendants' motions, granted the EEOC's motions, and entered judgment in favor of the EEOC, and an injunction against Flipmeastack, Inc. This appeal followed. For the reasons set forth below, we reverse in part, and affirm in part.

## I. Background

The recitation of the relevant facts that follow are presented in the light most favorable to the EEOC, as they relate to the Defendants' Rule 50 motion and the jury's verdict. *Molnar v. Booth*, 229 F.3d 593, 597 (7th Cir. 2000). All other facts necessary for resolution of this appeal, including the facts relevant to the district court's conclusion that Flipmeastack was an "employer" of Shisler and Powell, will be addressed in the Discussion Section.

## A. The Defendants

Janmohammed was the principal owner and franchisee of twenty-one IHOPs, including the Racine IHOP. He operated the Racine IHOP under the franchise name of MHR[1], and was its president and sole shareholder. MHR contracted with Flipmeastack, a company solely owned by Janmohammed's wife, Victoria Janmohammed, to provide management consulting services for his IHOPs. These services included accounting and payroll, corporate IHOP franchise reporting and compliance, and human resources assistance. In addition, Flipmeastack hired the district managers, who, in turn, hired the general managers of each restaurant in the district, and oversaw the day-to-day operations

---

[1] MHR dissolved, and its assets were sold, after the events giving rise to this case occurred.

of those particular restaurants. In 2005, Steve Smith was the district manager of the Racine IHOP, Michelle Dahl was the general manager, and Nadia Del Rio and Rosalio "Junior" Gutierrez were the assistant managers. The employees of each restaurant, including the general manager, assistant managers, and servers, were employees of MHR.

**B. The Sexual Harassment Policy**

In 2005, Flipmeastack formulated and updated the Sexual Harassment and Diversity Policy for managers and employees of MHR. The policy indicated that "any form of unlawful harassment of co-workers or members of the public is absolutely forbidden, regardless of whether it is verbal, physical, or visual harassment." It also stated that employees "will report any instances of improper behavior to my manager or company representative." Victoria Janmohammed confirmed that Gutierrez, Del Rio, and Dahl were managers or "company representatives" within the meaning of the policy, and that a complaint to any one of those three would be effective. As the general manager, Dahl was responsible for maintaining a workplace free of sexual harassment and for reporting instances of sexual harassment to upper management, and Del Rio was responsible for training all new hires. This training consisted of showing all new hires a sexual harassment videotape, handing them a copy of the sexual harassment policy, and asking them to read and sign it. Both Shisler and Powell viewed the video-

tape and signed Flipmeastack's sexual harassment policy. Shisler's and Powell's signed copies of the sexual harassment policy, like all copies signed by IHOP servers, were locked in a file cabinet. The complaint procedure was not available in print.

In 2005, corporate IHOP directed that a crisis management guidelines poster be displayed in every IHOP restaurant. The poster provided a list of telephone numbers in case of an emergency, such as an armed robbery, flood, earthquake, or "other emergency," such as a "discrimination claim." The poster included the telephone number of Flipmeastack, the corporate number of IHOP, and the cell phone number of Smith. Neither Shisler nor Powell had any recollection of seeing the poster in the Racine IHOP.

## C.  The Claimants

Shisler, a teenager, worked at the Racine IHOP on two different occasions. During her first term of employment in January 2004, Shisler testified that the general manager of the Racine IHOP, Charles Hecker, was sexually harassing a female server named Christine. Shisler gave Smith a written letter informing him of that fact, and complaining that she and her boyfriend were receiving unfair work assignments. According to Shisler, Smith's response was "passive" and he never "really sa[id] whether or not he was going to take care of it." Shisler never heard from Smith regarding those issues; however, she testified that Hecker started

to treat her differently, and "stated things that he only could have either been told, or read himself in the letter." After things worsened with Hecker, Shisler "called the Corporation" and was told she "had to go to [Smith] about it." In light of Hecker's treatment of her, she did not complain again to Smith. Ultimately, Hecker fired Shisler.

Her second term of employment began on March 3, 2005. By this time, Dahl served as the general manager of the Racine IHOP. Gutierrez, who was approximately 10 years older than Shisler, was relatively new to the position and worked as the night manager (5:00 p.m. to 3:00 a.m.), while Shisler worked the second shift (3:00 p.m. to 11:00 p.m.); consequently, their schedules overlapped. Shisler testified that whenever she worked with Gutierrez, he made sexually charged comments to her, including, "I want to take you in the back and fuck you over the pancake batter," "I bet you're kinky," and "you like it rough." Gutierrez even propositioned her for three-way sex with his (allegedly) bisexual girlfriend. Gutierrez stared at her body, breasts and buttocks, like she was "a piece of meat," rubbed her shoulders and pressed his body up against hers, and made her feel very "uncomfortable." Shisler "told him to get the fuck away from [her]." She felt "bullied" by him and felt "dirty" after he told the cooks in Spanish that he wanted to have sex with her. On March 18, 2005, Shisler, along with two other servers, reported Gutierrez's behavior to Del Rio. Shisler told Del Rio that she would have to be "blind" if she did not "see it going on." Del Rio "blew [them] off," shook her head, and called them "silly girls."

At some point after Shisler reported Gutierrez's behavior to Del Rio, Gutierrez "slap groped" her buttocks as she was bending over to pick up hot sauce from the floor. Shisler told Gutierrez to "get the fuck off [her]." On March 27, 2005, Shisler reported Gutierrez's behavior to Dahl, who said that this was "none of [her] concern" and then said "we're done here." After her complaints fell on deaf ears, Shisler "gave up" and kept working "because [she] needed the money." On April 3, 2005, Dahl terminated Shisler for violating the Racine IHOP's coupon policy, which barred servers from possessing coupons and giving them to customers.

Powell, also a teenager, worked at the Racine IHOP from October or December 2004 until June 2006. Powell generally worked the first shift (6:00 a.m. to 3:00 p.m.), so she worked with Gutierrez when their schedules overlapped—approximately once a week. Powell testified that in late February 2005, Gutierrez began to make offensive comments to Powell such as her "ass looked good in them pants." Initially, Powell thought Gutierrez's comments were "inappropriate," but "laughed it off, thinking it was a joke[.]" Powell's thoughts changed when "his harassment continued and became more severe," to the point where "she tried to avoid him at all costs."

Gutierrez pulled her ponytail whenever he could and told her that she "liked it because [she] would like [sex] rough." Gutierrez also whispered in her ear that he would like to "eat [her] out" and left a voicemail on Powell's cell phone asking Powell "to hook up" with him.

On one occasion while Powell and Gutierrez were in the kitchen, Gutierrez told the cooks in Spanish "how badly he wanted to fuck [Powell] and [she] wouldn't let him" and then translated what he said to her. He also told her "he thought [she] would get freaky with sex." On another occasion, Gutierrez took Powell into the dry storage area and pressed himself up against her while telling her that he "would like to do [her] from behind." Powell also recalled that when Gutierrez walked past her, he would frequently brush up against her breasts and buttocks. Powell repeatedly objected to Gutierrez's behavior, and asked him to "knock it off." In response, Gutierrez "seemed to yell at [her] more" or gave her "harder things to do."

Powell testified that during the first week of April 2005, she complained to Dahl that Gutierrez was "sexually and physically abusing [her] and other female workers" and "grabbing us and saying dirty things to us." Although Dahl said she "would take care of it," Dahl did nothing to address her complaints. Powell also testified that Del Rio, prompted by the complaints from other servers, asked Powell if Gutierrez was treating her in an inappropriate way. Although Powell responded "yes," Del Rio did not report these complaints to upper management. When Gutierrez continued with his harassing behavior, Powell reported his inappropriate conduct to Dahl again, but Dahl cut her off by saying that "[she] didn't need to hear it." Eventually, like Shisler, Powell "learned not to say anything."

## D. The Investigation

Shisler's attorney hired Lilly Brown, a private investigator, to obtain information about Shisler's termination and to determine whether sexual harassment was occurring at the restaurant. Between May 10, 2005, and May 25, 2005, Brown interviewed servers of the Racine IHOP, including Powell. On May 21, 2005, in the midst of the investigation, Gutierrez quit his position as assistant manager.

On May 23, 2005, Del Rio informed Smith that a private investigator was asking about Gutierrez's harassment of servers. This prompted Smith to conduct his own investigation. Because Gutierrez had already quit his position, Smith could not take any corrective action against him. Smith, however, determined that Shisler and Powell had complained to Dahl and that Dahl should have acted on their complaints. Smith determined that Dahl violated the sexual harassment policy by not investigating their complaints and terminated her.

## E. Dahl's Lawsuit

Following her termination, Dahl filed a lawsuit against MHR alleging that Smith sexually harassed her. Her case was based, in part, on the allegation that Smith rubbed his finger over the cleavage area of Dahl's daughter's picture. Gutierrez testified that he witnessed the event, and heard Smith comment, "if only she was 18." Gutierrez testified that Smith's comment made him uncomfortable, but he did not report this incident because he was fearful he would lose his job. Dahl confronted Smith about this incident, but Smith told her that if she reported him,

he would "deny everything." At any rate, at the trial of this matter, Smith testified that the case was ultimately dismissed on summary judgment in December 2008.

**F. Jury Trial**

The jury trial commenced on November 16, 2009. The jury heard the accounts noted above from Shisler, Powell, Smith, Dahl, Del Rio, and Gutierrez, among others. The jury was asked to determine whether Shisler and Powell had been subjected to a hostile work environment. The Defendants' *Faragher/Ellerth* affirmative defense was included in the jury instructions, but the verdict form did not include a specific interrogatory with respect to the defense. The jury was also asked to consider whether Shisler was terminated in retaliation for complaining of sexual harassment. The jury instructions and verdict form referred to the three Defendants collectively, because the district court reserved ruling on the corporate liability of Flipmeastack post trial.

On November 19, 2009, the jury returned a special verdict form in favor of Shisler and Powell on the sexual harassment claims, and in favor of the Defendants on Shisler's retaliation claim. The jury awarded Shisler $1,000 in compensatory damages, and awarded Powell $4,000 in compensatory damages and $100,000 in punitive damages.

### G. Post-Trial Motions and Rulings

Following the jury verdict, the Defendants moved for Judgment as a Matter of Law or for New Trial under Rule 50(b) of the Federal Rules of Civil Procedure. In support of their Motion for Judgment as a Matter of Law, the Defendants argued that no rational jury could have found Shisler and Powell experienced a hostile work environment, and that, in any event, they had established their *Faragher/Ellerth* affirmative defense. The Defendants also argued that the jury's award of $100,000 in punitive damages must be stricken as against the great weight of the evidence. In support of their Motion for New Trial, the Defendants argued that the district court committed prejudicial error by failing to include a specific question regarding the Defendants' affirmative defense on the verdict form, and by admitting "other acts" evidence, over their objection. The Defendants also argued, in the alternative, that the punitive damages award should be reduced pursuant to the statutory cap of $50,000.

The EEOC raised two issues in its Post-Trial Motions. First, it contended that all three Defendants were jointly and severally liable for the amounts set forth in the jury's verdict. Second, it contended that injunctive relief should be awarded against Flipmeastack and that such other relief should extend to all of the IHOP restaurants it manages.

In its Decision and Order, the district court denied the Defendants' Motion for Judgment as a Matter of Law and for New Trial or Remittitur. In addition, the district court granted the EEOC's Post-Trial Motions, finding

that Flipmeastack was an employer of Shisler and Powell, and thus, liable for the $105,000 jury verdict and enjoined Flipmeastack from, *inter alia*, "allowing a sexually hostile work environment to exist in any restaurant under its management."

## II.  Analysis

### A.  Defendants' Motion for Judgment as a Matter of Law

We review *de novo* the district court's denial of the Defendants' Motion for Judgment as a Matter of Law. *Erickson v. Wisconsin Dep't of Corrections*, 469 F.3d 600, 601 (7th Cir. 2006). " 'Our inquiry is limited to the question whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed.' " *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) (quoting *Tammi v. Porsche Cars N. Am., Inc.*, 536 F.3d 702, 707 (7th Cir. 2008)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are within the province of the jury." *Bogan v. City of Chicago*, 644 F.3d 563, 572 (7th Cir. 2011) (internal quotation marks and citations omitted). We must reverse only if, "on the basis of the admissible evidence, no rational jury could have found for the prevailing party." *Id.* (citing *Walker v. Bd. of Regents of the Univ. of Wis. Sys.*, 410 F.3d 387, 393 (7th Cir. 2005)); *see also Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 630 (7th Cir.

1996) ("'[W]e are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and in the judge (in not interfering with that verdict.'" (quoting *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir. 1990))).

### 1.  Sexual Harassment Claims

A sexually hostile or abusive work environment is a form of sex discrimination under Title VII of the Civil Rights Act of 1964. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). For sexual harassment to be actionable, a plaintiff must prove conduct that is so severe or pervasive as "'to alter the conditions of [her] employment and create an abusive working environment.'" *Id.* at 67 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). In determining whether the harassment rises to this level, we consider the totality of the circumstances, including the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Gentry v. Expert Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993)). In evaluating the severity of harassment, we are guided by prior case precedent:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or

gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (internal citations omitted). We also assess the impact of the harassment on the plaintiff's work environment from both a subjective and objective viewpoint; "'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry*, 238 F.3d at 850 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

We find that a rational jury could have found that Shisler was subjected to harassment that was both severe and pervasive. At the trial of this matter, Shisler testified that Gutierrez engaged in sexually harassing conduct during every shift that Gutierrez was her assistant manager. His comments to Shisler were highly offensive and easily surpassed what could reasonably be described as vulgar banter, tinged with sexual innuendo. He told her he wanted to "fuck her," propositioned her for three-way sex with his girlfriend, told her she was "kinky" and liked "rough" sex, and stared at the intimate parts of her body "like a piece of meat." Gutierrez engaged in physical touching by "slap groping" her buttocks. Shisler testified that she felt "bullied" by him and that his comments made her feel "dirty." Given the age difference between Shisler and Gutierrez and Gutierrez's position of authority over her, a rational jury could have concluded that Gutierrez's verbal and physical harassment directed at Shisler created an objectively hostile and abusive work environment.

The Defendants attack Shisler's credibility by arguing that on cross-examination, she could only identify three specific instances of sexually harassing comments and conduct by Gutierrez over the four-week period that she worked at the Racine IHOP. As noted, however, Shisler testified to more than three specific instances of conduct, and she testified that some form of verbal harassment occurred on every shift that she worked with Gutierrez. Although Shisler could not remember the exact dates that specific instances of sexual harassment occurred, the jury was entitled to believe Shisler's version of events.

In any event, to prevail, Shisler need not show that the conduct complained of was both severe *and* pervasive; "even one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (citations omitted). A jury could infer that the three instances that Shisler did testify to—telling her that he thought she was "kinky" and liked it "rough," propositioning her for sex on the pancake batter, and "slap groping" her buttocks—were sufficiently severe to support a jury verdict. *See Baskerville*, 50 F.3d at 431 (noting that even if a plaintiff's allegations of sexual harassment are on the line between the merely unpleasant and the sexually harassing, "the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error").

The Defendants also suggest that Shisler was not subjectively offended by Gutierrez's crude comments because her MySpace page contained a sexually graphic video

of young males masturbating in the presence of young females, and contains the comment, "funny as hell." The jury was entitled to disregard this video as evidence that Shisler did not find Gutierrez's comments to be offensive. As the district court observed, "sharing jokes with friends in an online community is vastly different than being propositioned for sex by a supervisor at work."

Further, there is sufficient evidence in the record showing that Shisler was subjectively offended by Gutierrez's comments and conduct because she repeatedly informed Gutierrez that his conduct was unwelcome and complained to IHOP managers Del Rio and Dahl. Accordingly, there is sufficient evidence in the record from which a rational jury could find that Shisler was the victim of sexual harassment while an employee at the Racine IHOP, in violation of Title VII.

We also find a rational jury could have found that Powell was subjected to a sexually hostile work environment. Powell testified that Gutierrez made inappropriate comments to her like "your ass looks good in them pants," pulled her ponytail and told her she "would like it rough" and "would get freaky with sex." He propositioned her for oral sex, told her he would like to "do her from behind" as he pressed his pelvis into her body, told the cooks he wanted to "fuck" her, and left a voicemail message on her phone asking her to "hook up" with him. Gutierrez touched her breasts and buttocks whenever he could by brushing up against her as he walked past her. Powell testified Gutierrez's comments made

her feel "dirty," and that she felt worried if she had to work on the same shift as Gutierrez. Powell also testified that when she objected to Gutierrez's treatment of her, he gave her harder work assignments or "yelled at her more," "[s]o she learned just not to say anything." Like Shisler, Powell was a teenager at the time. The age disparity between Powell and Gutierrez, coupled with Gutierrez's position of authority over her, could have led a rational jury to conclude that Gutierrez's verbal and physical harassment directed at Powell created an objectively hostile and abusive work environment, and that Powell reasonably perceived it as such.

### 2. The *Faragher/Ellerth* Affirmative Defense

An employer can be held vicariously liable for a supervisor's sexual harassment of a subordinate. Generally, an employer may avoid liability if it can prove the two elements of the *Faragher/Ellerth* affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807.

### a. Defendants' Preventative Measures

The Defendants contend that they took sexual harassment seriously, and instituted an effective sexual harass-

ment policy to prevent and promptly correct any instances of sexual harassment occurring in the workplace. Victoria Janmohammed testified that the policy was a "zero tolerance" policy, meaning "we do not tolerate any sexual harassment, any discrimination. We don't even tolerate somebody not investigating." To this end, the Defendants required all of their new employees, including Shisler and Powell, to watch a video educating them on sexual harassment in the workplace, and to read and sign their sexual harassment policy. The Sexual Harassment and Diversity Policy that Shisler and Powell signed stated the following:

> I have watched the Sexual Harassment and Diversity videos. I am fully aware of our companies [sic] policies regarding both—zero tolerance for any type of unlawful discrimination and/or harassment. Our company is committed to providing a work environment that is free of unlawful behavior in any form. I will lead by example.

* * *

> Any form of unlawful harassment of co-workers or members of the public is absolutely forbidden, regardless of whether it is verbal, physical, or visual harassment. You must be sensitive to the feelings of others and must not act in a way that might be considered offensive to someone else. I will report any instances of improper behavior to my manager or company representative. The company will take immediate and appropriate steps to investigate all reports of improper behavior.

> I also understand the severity of knowingly making false accusations of discrimination or harassment. Sexual Harassment and/or Discrimination are a serious charge and should be taken seriously.

In addition, the Defendants also note the presence of the Crisis Management Guidelines Poster in the employee break room that displayed, in part, Smith's cell phone number. Lastly, Defendants point out that as soon as Del Rio informed Smith that a private investigator was asking questions about sexual harassment at the Racine IHOP, he immediately conducted an investigation, took witness statements, determined that the policy had been violated, and took corrective action by firing Dahl for her failure to investigate the servers' allegations.

We find that a rational jury could have concluded that the Defendants exercised reasonable care by instituting a sexual harassment policy with a reasonable complaint mechanism, and by engaging in prompt and corrective action by investigating Shisler's and Powell's complaints of harassment and terminating Dahl. Like the district court, however, we find that the evidence was sufficient for a jury to find otherwise. Although the presence of a sexual harassment policy is encouraged by Title VII, "the mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace." *Gentry*, 238 F.3d at 847. The policy must provide "a meaningful process whereby an employee can express his or her concerns regarding an individual within a working environment." *Id*. Case law also requires that the policy's

complaint mechanism be reasonable, "and what is reasonable depends on the employment circumstances, and therefore, among other things, on the capabilities of the class of employees in question." *EEOC v. V&J Foods, Inc.*, 507 F.3d 575, 578 (7th Cir. 2007) (internal quotation marks and citations omitted). Moreover, the policy must not only be reasonably effective on paper, but also reasonably effective in practice. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 350 (6th Cir. 2005).

Despite the fact that the Defendants had a sexual harassment policy in place, a rational jury could have found that the policy and complaint mechanism were not reasonably effective in practice. At trial, the jury heard evidence indicating that all managerial employees at the Racine IHOP failed to carry out their duties under the policy. *See Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407 (7th Cir. 2005) (finding that "the consistent stream of harassment at the restaurant suggests that Malnati's policy was actually not very effective at all"). For example, Gutierrez violated the policy by engaging in sexual harassment. The other assistant manager of the Racine IHOP, Del Rio, and the general manager of the Racine IHOP, Dahl, both failed to report Gutierrez's harassment after Shisler and Powell complained to them. Moreover, the jury heard evidence that Smith failed to investigate Shisler's prior complaint of harassment of another female server by the former general manager of the Racine IHOP, Hecker. The jury also heard evidence that Smith engaged in inappropriate conduct that could be described under the policy as sexual harassment,

by rubbing his finger over the cleavage area of a picture of Dahl's teenage daughter and stating, "if only she was 18." Gutierrez testified that he witnessed this incident, but did not report it. A rational jury, faced with this evidence, could have found that none of the managers of the Racine IHOP took action under the policy that could be termed "corrective" or "effective." *See Clark*, 400 F.3d at 350 ("The effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it.").

Second, although management was required to take sexual harassment training, the evidence at trial suggested that the training was inadequate. Del Rio testified that she did not receive sexual harassment train-ing when she became an assistant manager, even though she, as the assistant manager, was responsible for the orientation and training of new employees. Moreover, even though the policy stated that "any form of unlawful harassment of co-workers or members of the public is absolutely forbidden," Del Rio "blew off" Shisler's and Powell's complaints. Del Rio knew that she had an absolute duty to report sexual harassment allegations to upper management, yet she did not report Powell's complaints because, in her opinion, Powell did not seem to be "afraid" of Gutierrez. Similarly, Dahl knew that she had an absolute duty to report such allegations to upper management. Yet, in the face of Powell's allegations that Gutierrez was "sexually and physically abusing [her] and other female servers," she failed to report Powell's complaints. On these facts, a rational jury could have concluded that, not only was the policy and the manage-

ment training ineffective, but the protections offered by them were illusory. *Gentry*, 238 F.3d at 847-50 (upholding jury's determination that employer failed to take preventative or corrective action regarding sexual harassment where evidence revealed deficiencies in harassment policy and a failure to respond to complaints).

Third, "[o]ur cases recognize prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action." *Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (citations omitted). Here, a rational jury could have concluded that Smith's investigation of Gutierrez's sexual harassment was not "prompt." Shisler complained to management of Gutierrez's harassment twice in March 2005, and Powell complained to management three times in April 2005. Smith did not commence his investigation until May 23, 2005. This is not the type of response " 'reasonably likely to prevent the harassment from recurring.' " *Id.* (quoting *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004)). In addition, a rational jury could have believed that an investigation ensued only because Shisler's private investigator started making inquiries of other female servers at the Racine IHOP.

Further, a rational jury could have concluded that the policy was not reasonably effective on paper. As the district court observed, an employer's complaint mechanism must provide a clear path for reporting harassment, particularly where, as here, a number of the servers were teenagers. *See V&J Foods*, 507 F.3d at 578 (noting that because it was part of V&J's business plan to

employ teenagers, "the company was obligated to suit its procedures to the understanding of the average teenager"). Flipmeastack's sexual harassment policy did not provide a point person to air complaints to. In fact, it provided no names or contact information at all. To the extent the Crisis Management Guidelines Poster was meant to supplement the sexual harassment policy in this regard, a rational jury could have concluded that it did not fulfill this role. First, neither Shisler nor Powell could recall whether the poster was actually displayed in the employee break room during the time that they were harassed. Second, the poster contains instructions on how to deal with natural disasters, fires, and other events such as food-borne illness. It also contains the phone numbers of local authorities, and Flipmeastack's corporate numbers, including Smith's cell phone number. The word "discrimination" is contained on the poster under the heading "other emergencies"; however, the poster does not inform an employee which company number to call in the event he or she believes that the *sexual harassment* policy has been violated. In addition, the poster did not describe employees' rights under Title VII or provide phone numbers for the EEOC or a local civil rights office, and thus, did not provide a means for the employee to make an external complaint of discrimination. These facts, and the inferences reasonably drawn from them, could have led a rational jury to conclude that the complaint mechanism provided by Flipmeastack's sexual harassment policy did not provide a clear path for reporting harassment. For all of these reasons, we find that the jury's determination that the Defend-

ants did not discharge their duty to effectively prevent and correct promptly sexual harassment in the workplace, was not unreasonable.

### b.  Shisler's and Powell's Preventative or Corrective Action

We now turn to the second element of the *Faragher/Ellerth* affirmative defense—i.e., whether Shisler and Powell unreasonably failed to take advantage of preventative or corrective measures. The Defendants' primary argument on appeal is that neither Shisler nor Powell ever complained to Smith, and there is "no doubt" that had they done so, "[Smith] would have taken prompt action to correct sexual harassment." The Defendants' argument ignores the terms of the sexual harassment policy itself, which provided that an employee was to "report any instances of improper behavior to [the employee's] manager or company representative." As the creator of the policy, Victoria Janmohammed affirmed this fact at trial. Shisler and Powell utilized the complaint mechanism by first asking Gutierrez, an assistant manager, to stop his harassing behavior. When Gutierrez refused to stop his harassment, both Shisler and Powell reported Gutierrez's harassment to Del Rio and Dahl—each of whom were managers or company representatives within the meaning of the policy.

During the month that Shisler worked at the Racine IHOP (March 2005), she first reported Gutierrez's harassment to Del Rio on March 18, 2005. After Del Rio failed to take action, Shisler reported the harassment to Dahl

on March 27, 2005. On cross-examination, Shisler testified that, after she last complained to Dahl, and Dahl "blew her off," she could have complained to Smith; however, Smith did not work that day, and would not be at the restaurant "until the very next Sunday, possibly." Shisler was terminated on April 3, 2005. Given this evidence, a rational jury could have believed that Shisler did not act unreasonably by failing to report Gutierrez's conduct directly to Smith.

In addition, a rational jury could have believed that Shisler did not feel comfortable reporting Gutierrez's harassment to Smith. Shisler testified that Smith failed to respond to her prior complaint of harassment by Hecker toward another server in 2004. Shisler also testified that after she complained to Smith, Hecker began to treat her more harshly. In light of this prior experience, a rational jury could have concluded that her decision not to contact Smith in 2005 was therefore justified.

Powell first complained to Dahl of Gutierrez's harassment during the first week of April 2005. Dahl responded that she "would take care of it." The following week, Del Rio asked Powell if Gutierrez had been treating her inappropriately, and Powell responded in the affirmative. Still, no action was taken. Powell last aired a complaint to Dahl during the last week of April, but Dahl told her that she "didn't need to hear it." While it is true, as the district court observed, that Powell *might* have complained to Smith after it became evident that neither Dahl nor Del Rio had corrected the problem, only about three to four weeks elapsed between the

time that Powell last complained to Dahl and the date that Gutierrez resigned. A rational jury could have concluded that Powell did not act unreasonably in failing to contact Smith during this time period. *See Hardy v. Univ. of Ill. at Chicago*, 328 F.3d 361, 365-66 (7th Cir. 2003) (stating that it is for the jury to determine whether employee unreasonably failed to avail herself of her employer's complaint procedures, and employee's delay of six weeks to report supervisor's misconduct after trying to deal with supervisor directly was not unreasonable as a matter of law). For all of these reasons, we find that the jury's determination that Shisler and Powell took prompt and appropriate action under the policy was not unreasonable.

### 3.  Punitive Damages

Punitive damages are available under Title VII when a plaintiff demonstrates that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Whether an award of punitive damages is proper is subject to a three-part inquiry. *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). The first two elements require the plaintiff to show that: (1) the employer acted with the requisite mental state—i.e., that it acted "in the face of a perceived risk that its actions will violate the federal law"; and (2) the employer's managerial agent recklessly disregarded the plaintiff's federally protected rights while acting within the scope of employment. *Id*. at 535-36,

543. Third, an employer may avoid vicarious liability for a managerial employee's discriminatory conduct if the employer can show that it engaged in good faith efforts to implement an anti-discrimination policy. *Id*. at 545. The Defendants challenge only the third element, claiming that this case presents a "textbook example of responsible employers implementing and following clear and effective sexual harassment policies."

While the Defendants' sexual harassment policy is relevant to evaluating whether an employer engaged in good faith efforts to comply with Title VII, "it is not sufficient in and of itself to insulate an employer from a punitive damages award. Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858-59 (7th Cir. 2001) (footnote collecting cases and citation omitted).

A rational jury could have concluded that the Defendants' policy was not sufficient to insulate it from a punitive damages award, because it was ineffective in advancing the education and protection of the employees' rights under Title VII. A rational jury could have concluded that certain policy language—i.e., noting the "severity of knowingly making a false accusation of discrimination or harassment"—was inserted to discourage complaints of sexual harassment. Indeed, Victoria Janmohammed testified that the language was inserted after her husband was sued for sexual harassment by a server at one of his IHOP restaurants. Although

she denied that the language was inserted into the sexual harassment policy in reaction to the lawsuit, the jury was entitled to disbelieve her. In addition, Smith testified that, once the servers viewed the sexual harassment video and signed the sexual harassment and diversity policy, the policy was locked in a file cabinet, not accessible to the servers without managerial approval. If the managerial approval had to come from a manager who happened to be the alleged harasser, this could present a significant hurdle for relief. *See V&J Foods*, 507 F.3d at 579 ("A policy against harassment that includes no assurance that a harassing supervisor can be bypassed in the complaint process is unreasonable as a matter of law."). Moreover, the complaint mechanism was mentioned in the video, but was not available in written form. To the extent the crisis management poster was meant to address this issue by providing the name and cell phone number of Smith, the poster was insufficient to fill the gap in information for the reasons previously stated regarding the Defendants' affirmative defense.

Further, a rational jury could have concluded that the Defendants did not engage in good faith efforts to educate their managerial staff about sexual harassment in the workplace. Del Rio testified that, although she received training on sexual harassment when she was a server, she did not receive additional training after she was promoted to assistant manager. As Del Rio was in charge of training all new employees on the Defendants' sexual harassment policy, her lack of training is troublesome. Moreover, Del Rio received numerous complaints of Gutierrez's sexual harassment from Shisler and Powell

(among others), but failed to report their complaints, in part, because she did not think Powell was serious. Gutierrez and Dahl received training on sexual harassment as managerial staff; however, neither complied with the policy by reporting the harassment to upper management. Gutierrez engaged in sexual harassment, and failed to report Smith when he made inappropriate comments while admiring a picture of Dahl's daughter. Dahl received complaints regarding Gutierrez's sexual harassment of servers on numerous occasions, but, like Del Rio, failed to report those claims to Smith or to upper management at Flipmeastack. Thus, as the district court found, a rational jury could have concluded that the Defendants' consistent failure to comply with the sexual harassment policy evinced a lack of understanding of what constituted sexual harassment under Flipmeastack's policy and what their responsibilities were as managerial staff under the policy. Accordingly, we find that there was a reasonable basis in the record to permit a jury to find that the Defendants did not engage in good faith efforts to comply with Title VII. The jury's punitive damages award stands against MHR[2] and Janmohammed; however, for the reasons advanced in Section II.C. of this opinion, the

---

[2] Because MHR is a dissolved corporation, the district court held that Janmohammed had to personally satisfy any judgment against MHR to the extent of the distributions he received as a result of the dissolution of MHR. The district court found that he received $15,000 from the sale of MHR's assets; thus, he was liable for that amount of the judgment against MHR. That issue is not the subject of this appeal.

punitive damages award against Flipmeastack is remanded to the district court.

We now turn to the district court's ruling denying the Defendants' motion for new trial.

## B.  Defendants' Motion for New Trial Pursuant to FED. R. CIV. P. 59(a)

Defendants challenge the district court's denial of their motion for new trial on two grounds. First, they contend that the district court abused its discretion by failing to include the *Faragher/Ellerth* affirmative defense on the special verdict form. Second, they contend that the district court admitted "other acts" evidence that prejudiced the jury against them. We review a district court's rulings on a motion for new trial for an abuse of discretion. *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 877 (7th Cir. 2011).

### 1.  Special Verdict Form

Whether to "submit special interrogatories (either on all issues or on a subset of issues like damages) is committed to the sound discretion of the district court." *Cruz v. Town of Cicero*, 275 F.3d 579, 591 (7th Cir. 2001) (citing *Bularz v. Prudential Ins. Co.*, 93 F.3d 372, 377 (7th Cir. 1996)). The verdict form asked the jury to decide whether the Defendants were liable for sexual harassment, but failed to include an additional interrogatory asking whether the Defendants were entitled to their

*Faragher*/*Ellerth* affirmative defense. The Defendants assert that the district court's failure to include on the special verdict form any interrogatories related to their affirmative defense impermissibly took the issue away from the jury, and constitutes an abuse of discretion. *See United States Fire Ins. Co. v. Pressed Steel Tank Co., Inc.*, 852 F.2d 313, 318 (7th Cir. 1988) (holding that Rule 49(a) of the Federal Rules of Civil Procedure requires a district court to submit all material issues raised by the pleadings and the evidence in a special verdict form).

The verdict form in this case was entitled "Special Verdict Form." Yet, as the district court described it, the verdict form was a general verdict form as it pertained to the Defendants' liability for sexual harassment, and a special verdict form as it pertained to damages. We are not aware of any rule that precludes this type of hybrid verdict form; Rule 49 does not. Our case law requires only that the verdict form not be confusing or misleading to the jury. *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 827 (7th Cir. 2010). In evaluating whether a verdict form is confusing or misleading, we consider the verdict form in light of the instructions given to determine "whether [the jury] had [an] understanding of the issues and its duty to determine those issues." *Id.* (internal quotation marks and citation omitted).

The Defendants do not challenge the district court's instructions to the jury, including the instructions on the elements of a claim for sexual harassment and the Defendants' *Faragher*/*Ellerth* affirmative defense. The instructions informed the jury that in evaluating whether the Defen-

dants were liable for Gutierrez's sexual harassment of Shisler and/or Powell, they were to consider whether the Defendants had proven their affirmative defense by a preponderance of the evidence. We find that the verdict form, read in light of the jury instructions, informed the jury that in finding the Defendants' liable, they were implicitly rejecting their affirmative defense. Therefore, the district court's decision not to include a question addressing the Defendants' affirmative defense on the liability portion of the verdict form was not an abuse of discretion.

### 2. "Other Acts" Evidence

We review claims of improperly admitted evidence for an abuse of discretion. *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 564 (7th Cir. 2006). Where the alleged error of admission occurred during trial, "we will grant a new trial only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *Id.* (internal quotation marks and citations omitted). "Evidentiary errors satisfy this standard only when a significant chance exists that they affected the outcome of the trial." *Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1082 (7th Cir. 1998) (citations omitted).

The Defendants object to two pieces of evidence admitted at trial: (1) Shisler's testimony that Hecker, the general manger of the Racine IHOP prior to Dahl, sexually harassed another female server named Christine, and (2) Dahl's testimony that Smith sexually harassed her.

Defendants contend this evidence was "irrelevant and highly inflammatory" and it "wrongly prejudiced the jury against defendants."

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." FED. R. EVID. 403.

Shisler testified that Smith's response to her report of Hecker's harassment was "passive." She also testified that, following her report to Smith, Hecker began to assign her the worst restaurant sections. When she contacted corporate IHOP, she was informed she had to complain to Smith. Given her recent experience with Smith, Shisler decided not to pursue the matter. Contrary to Defendants' assertion, Shisler's testimony regarding Hecker's harassment was relevant to the Defendants' *Faragher/Ellerth* affirmative defense because, as the district court reasoned, it suggested that Flipmeastack's sexual harassment policy was not reasonably effective.

Dahl testified that she was sexually harassed by Smith. The district court found that her testimony was also relevant to the Defendants' *Faragher/Ellerth* affirmative defense. The Defendants contend that they were prejudiced by the admission of Dahl's testimony, because her lawsuit against MHR, alleging that Smith sexually harassed her, was dismissed by the district court on summary judgment eleven months before the trial of this matter commenced.

The subject of Dahl's lawsuit was addressed during Smith's testimony. He testified that Dahl's lawsuit was "dismissed" because "there was no merit to it." Thus, any prejudice caused by the admission of Dahl's testimony was cured by Smith's testimony. Accordingly, we find the admission of Shisler's and Dahl's testimony was not an abuse of discretion.

## C. EEOC's Post-Trial Motions

The EEOC's Post-Trial Motions include a motion to find the Defendants jointly and severally liable, and a motion for injunctive relief against Flipmeastack. We first address the district court's order holding Flipmeastack liable for the sexual harassment of the claimants. We review the district court's conclusion of law *de novo*. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 758-59 (7th Cir. 2010).

### 1. Corporate Liability

Prior to trial, the EEOC filed a motion in limine regarding corporate liability. The motion asked the district court to rule, as a matter of law, that Flipmeastack, as an affiliate corporation of MHR, should be held liable for Gutierrez's harassment of Shisler and Powell under two of the three theories advanced in *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940-41 (7th Cir. 1999) (holding that an affiliate's corporate existence may be disregarded, and the affiliate held to be an employer under Title VII, in "three situations"; the traditional conditions are present

to pierce the corporate veil, the affiliate splits itself into tiny corporations for the express purpose of avoiding liability under Title VII, and the parent corporation directed the discriminatory act of which the plaintiff is complaining). The EEOC argued under the "first situation" of *Papa* that MHR's corporate liability should be pierced and that Flipmeastack should be held the real employer of Gutierrez at the Racine IHOP. It also argued under the "third situation" of *Papa* that Flipmeastack should be held liable for directing the discriminatory act, because it "was the entity responsible for the inadequate HR policies and practices that allowed the harassment to occur and continue . . . ." After the motion was fully briefed, the district court held a pre-trial conference, the minutes of which state, "Court to resolve motions in limine on 3 corporate law issues after trial, if necessary. EEOC may file objection to this procedure." Following oral argument, we requested a transcript of the pre-trial conference from the district court. Although there was no transcript, the district court explained, in a written memorandum, that it chose to rule on the issue of Flipmeastack's corporate liability because it believed that if "the facts relating to corporate structure and the relationship between the three defendants had been addressed during trial, the trial would have been much longer and more complicated than it was." Neither the Defendants nor the EEOC objected to this procedure.

In its post-trial motion, the EEOC submitted the issue of Flipmeastack's corporate liability to the district court on the same grounds asserted in its motion in limine. In

the district court's Decision and Order, it found that the control theory advanced in *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995) applied, and that *Papa* "was not entirely on point." Moreover, the district court rejected the grounds upon which the EEOC based its claim of Flipmeastack's corporate liability. It found that "Flipmeastack is a distinct legal entity," and that "Flipmeastack did not direct Gutierrez's behavior."

We agree with the Defendants that the control theory of liability was injected into the case too late. In support of our ruling, we find *Burdett v. Miller*, 957 F.2d 1375 (7th Cir. 1992) directly on point. In *Miller*, we overturned a RICO conviction based on an enterprise theory raised not by the parties, but by the district court when it entered its findings of fact and conclusions of law post trial. The complaint alleged that Miller and his accounting firm were an enterprise that engaged in a pattern of racketeering activity consisting of misleading statements and omissions that violated federal securities laws. *Id*. at 1379. The plaintiff maintained her enterprise theory throughout the trial. *Id*. at 1380. In the district court's findings of fact and conclusions of law, it found the accounting firm had not been involved in the alleged illegal activity, so there was no enterprise consisting of Miller and his accounting firm. *Id*. at 1379. Instead, the district court found Miller and three of his associates in the fraud constituted a RICO enterprise, even though, during the trial, there was "no mention of an enterprise consisting of the four conspirators themselves." *Id*. at 1380. We concluded that although there was extensive evidence concerning

Miller's connection with his three associates, the parties did not consent, within the meaning of Rule 15(b) of the Federal Rules of Civil Procedure, to define the enterprise as consisting of Miller and his three associates during the trial. *Id*. Indeed, we noted that "Miller had no warning that evidence manifestly admissible because relevant to the conspiracy charge would also be used to establish the existence of an enterprise to which no one in the course of this litigation had alluded." *Id*. Accordingly, we held that the district court committed prejudicial error by changing the theory of the case after the close of the evidence, because it ran counter to the spirit of the adversary system and deprived the defendant of the opportunity to rebut the new enterprise theory. *Id*.

In the EEOC's pre-trial and post-trial motions, it relied solely on the "first" and "third situation" raised in *Papa*. After completion of post-trial briefing, the district court, *sua sponte*, injected an entirely new theory of liability based upon a case never cited by either party, *EEOC v. Illinois, supra*. The district court reframed the issue as "whether the defendant so far controlled the plaintiff's employment relationship that it [is] appropriate to regard [Flipmeastack] as the de facto or indirect employer of the plaintiff." In so ruling, the district court deprived the Defendants of presenting contrary evidence. This error is not harmless. It is evident from the district court's post-trial Decision and Order that had it decided Flipmeastack's corporate liability strictly from the parties' written submissions, it would have found Flipmeastack not liable for Shisler's and Powell's sexual harassment.

There is one other issue to address. At oral argument, we raised concerns regarding the district court's decision to remove the corporate liability issue from the province of the jury. The EEOC submits that the Defendants waived their right to a jury by failing to object. The record reflects that the Defendants did not raise an objection to the district court's decision to rule on the corporate liability issue before trial for two reasons. First, the Defendants understood that the EEOC was seeking to pierce the corporate existence of MHR and find that Flipmeastack was an employer of Gutierrez. Second, the Defendants did not believe that *Papa* applied to the facts of the case. Accordingly, we find that the Defendants did not waive their right to a jury with respect to the control theory of liability.

Because the district court injected a new theory of the case after the time the Defendants could present rebuttal evidence, and because the district court reserved ruling on an issue ultimately found to be a question for the jury, the district court's ruling with respect to the corporate liability of Flipmeastack is reversed and remanded for trial.

### 2. Injunction Against Flipmeastack

The Defendants also object to the district court's order enjoining Flipmeastack from "allowing a sexually hostile work environment to exist in any restaurant under its management," and ordering Flipmeastack to create a new sexual harassment training program, a new written anti-harassment and anti-discrimination

policy, and to post a Notice in its restaurants informing employees of the court's Order for a period of four years. Because we reverse the district court's finding of liability with respect to Flipmeastack, we need not address the Defendants' specific objections. The injunction against Flipmeastack must be dissolved.

### D.  Motion for Remittitur

Lastly, we address the district court's denial of Defendants' motion to remit Powell's punitive damages award from $100,000 to $50,000 pursuant to 18 U.S.C. § 1981(b)(3)(A). In denying the motion, the district court found that Powell was an employee of Flipmeastack, and because Flipmeastack managed at least 201 employees, Powell's compensatory and punitive damages award was within the statutory cap. *See* 18 U.S.C. § 1981a(b)(3)(C) (providing that the statutory cap for compensatory and punitive damages "in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year [is] $200,000"). Because this appeal leaves the liability of Flipmeastack unresolved, we are unable to address the propriety of the district court's ruling. We therefore remand this issue for the district court to address if, and when, Flipmeastack is found liable for the judgment.

### III.  Conclusion

We affirm the district court's denial of the Defendants' Motion for Judgment as a Matter of Law and Motion

for New Trial with respect to Defendants, MHR and Salauddin Janmohammed. We reverse the district court's grant of the EEOC's Post-Trial Motions; the judgment against Flipmeastack is reversed and remanded, and the injunction dissolved. Because Flipmeastack's liability for Powell's punitive damages award hinges on the degree of control Flipmeastack had over the employees of MHR, the punitive damages award against Flipmeastack, and the need, if any, to remit that award pursuant to the statutory cap, are also remanded. The district court is ordered to conduct proceedings consistent with this opinion.